[L.A. No. 32133. Oct. 26, 1987.]

M. L. KING et al., Plaintiffs and Appellants, v.
GEORGE MEESE, as Director, et al., Defendants and Respondents.

## COUNSEL

Armando M. Menocal III, Angela Glover Blackwell, Lois Salisbury and James R. Wheaton for Plaintiffs and Appellants.

Paul Hoffman, Mark D. Rosenbaum, Gary Williams, Wesley Fenderson, Jr., City Attorney (Compton), Troy B. Smith, Deputy City Attorney, Harry M. Snyder and Gail K. Hillebrand as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Henry G. Ullerich and Christopher C. Foley, Deputy Attorneys General, for Defendants and Respondents.

Ronald A. Zumbrun, Anthony T. Caso, Lee Roy Pierce, Jr., Allen M. Katz, Munger, Tolles & Olson, Horvitz, Levy & Amerian, Ellis J. Horvitz, Peter Abrahams, O'Donnell & Gordon, Pierce O'Donnell, Anne B.

Roberts, Gail Ruderman Feuer and Allan Ides as Amici Curiae on behalf of Defendants and Respondents.

OPINION

PANELLI, J.—In this case we are called upon to determine whether, as plaintiffs allege, the 1984 Robbins-McAlister Financial Responsibility Act (Stats. 1984, ch. 1322), when considered in relation to the relevant provisions of the Insurance Code pertaining to automobile insurance, fails to provide drivers with adequate procedural due process of law. For the reasons set forth below we hold that plaintiffs' concerns are legally without merit, and are more properly addressed to the Legislature than to the courts.

## I. *Legislative Framework*

California first enacted a financial responsibility law in 1929, which, like those that followed, required all drivers to be "financially responsible" (usually by means of insurance) for any injury they caused while driving. However, enforcement of the requirement was triggered only when the driver *was at fault* in an accident causing either bodily injury, or property damage in excess of $100 (later amended to $200). Even then, there was no sanction for failing to have insurance if the driver was able to post a bond in an amount determined by the Department of Motor Vehicles (DMV) to be sufficient to meet the likely liability. Failure to either post a bond or provide proof of financial responsibility resulted in suspension of driving privileges.

In 1931, we held this law constitutional as against a substantive due process challenge, specifically that not all drivers could afford to comply with the law, and that negligent wealthy drivers could continue to drive but that not so negligent but less affluent drivers could have their licenses suspended. (*Watson* v. *Department of Motor Vehicles* (1931) 212 Cal. 279 [298 P. 481].)

In 1974, the financial responsibility law was amended to require the posting of a bond or the filing of proof of financial responsibility whenever a driver *was involved* in an accident resulting in either bodily injury, or property damage exceeding $200, regardless of fault. That too was held to be constitutional in light of an uncodified statute declaring that the purpose of the law was not so much to deter negligent drivers, but rather to insure that everyone, negligent or not, was able to compensate for any harm they

caused while driving. (Stats. 1974, ch. 1409, § 1, held constitutional in *Anacker* v. *Sillas* (1976) 65 Cal.App.3d 416, 421-422 [135 Cal.Rptr. 537].)

In 1984, the Legislature, concerned that too many motorists still were not financially responsible, enacted the Robbins-McAlister Financial Responsibility Act (1984 Act). In addition to the requirements of prior enactments, the 1984 act allows a peace officer to request proof of financial responsibility "whenever a notice to appear is issued" for any alleged moving violation. (Veh. Code, § 16028.)[1] Failure to provide such proof is itself an infraction. (*Ibid*.) However, if it is established that the driver actually was financially responsible at the time in question notwithstanding the lack of written evidence, the citation will be dismissed. (Veh. Code, § 16028, subd. (e).) If such proof is not forthcoming, the driver is subject to a fine ranging from $100 to $240. (Veh. Code, § 16028, subd. (a).) Moreover, within 60 days of that conviction, the driver must provide proof of financial responsibility (and maintain it for three years) or the driver's license will be suspended. (Veh. Code, § 16034.)

From the foregoing, it is clear that the 1984 Act significantly increased the need for insurance. Now, for the first time, failure to have written evidence of financial responsibility is itself an offense. Nonetheless, the full implications of the financial responsibility laws cannot be understood without reference to the Insurance Code.

California is a so-called "open rate" state, that is, rates are set by insurers without prior or subsequent approval by the Insurance Commissioner (Commissioner). (Ins. Code, § 1850.) This is not to say, however, that there is absolutely no regulation of the rates. California law does require that rates not be "excessive, inadequate or unfairly discriminatory." (Ins. Code, § 1852.) No rate is excessive unless: "(1) such rate is unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable." (*Ibid*.) Risk classifications are permissible if based on any

---

[1] Section 16028 provides in pertinent part: "(a) Every person who drives a motor vehicle required to be registered in this state upon a highway . . . shall, when required by a peace officer pursuant to subdivision (c) or (d), provide evidence of financial responsibility for the vehicle. . . . [¶] (c) Whenever a notice to appear is issued for any alleged violation of this code, . . . the cited driver shall furnish written evidence of financial responsibility, as defined by subdivision (b), upon request of the peace officer issuing the citation. . . . If the cited driver fails to provide evidence of financial responsibility at the time the notice to appear is issued, the peace officer may issue the driver a notice to appear for violation of subdivision (a). . . ."

There are various forms of proof of financial responsibility, but the most common, and the one at issue here, is a certificate of insurance. The certificate must verify that the insured is covered for not less than $15,000 per person bodily injury, $30,000 per accident bodily injury, and $5,000 per accident property damage. (Veh. Code, §§ 16028, subd. (b), 16056.)

reasonable (i.e., actuarially sound), and not prohibited, ground. (Ins. Code, § 1852, subd. (d).) Although the term "unfairly discriminatory" is not defined in Insurance Code section 1852, section 11628 of that code prohibits discrimination by an insurer with regard to issuance of policies, or the terms of such policies, on the basis of "race, language, color, religion, national origin, ancestry, or location within the same geographic area." "Geographic area" is defined as an area "not less than 20 square miles," and is made up by combining a series of contiguous zip code zones. Under the statutory scheme, different geographic areas may be treated differently.

Although insurers need not file their rates with the Commissioner, nor obtain approval of rates, the Commissioner may on his own initiative investigate rates. (Ins. Code, § 12924.) Moreover, a person objecting to a rate or classification may file a complaint with the insurer and, if dissatisfied with the insurer's response, file a complaint with the Commissioner. (Ins. Code, § 1858.)

The Commissioner may, at his option, dismiss the complaint without investigation. (*Ibid.*) In fact, the Commissioner routinely does so if the complaint fails to come within his perceived jurisdictional powers. A common example of a routinely dismissed complaint is one alleging a refusal by an insurer to provide coverage to an applicant.[2] If the Commissioner does investigate, he may hold public hearings, issue findings, and assess penalties. The decisions of the Commissioner are subject to judicial review. (Ins. Code, § 1858.6.) Should the Commissioner make a determination that the rates are excessive or are not excessive, then the complainant, on request, is entitled to know the basis of such determination. (Ins. Code, § 1858.7.) In this regard, plaintiffs allege that only once in the last decade has the Commissioner declared a rate to be excessive.

In California, in addition to the regular and customary sources for the purchase of insurance coverage which most are familiar with, drivers may be insured through the California Automobile Assigned Risk Plan (CAARP). (Ins. Code, § 11620 et seq.) By statute this plan is available to any driver otherwise entitled to insurance but who has been unable in good faith to obtain it within the past 60 days. (Ins. Code, § 11620; Cal. Admin.

---

[2] The Commissioner is of the opinion that an insurer may refuse to insure based on any permissible classification. Hence, an insurer may decide not to write any policies in a geographic area without violating the Insurance Code, and so the Commissioner is without jurisdiction to enjoin the conduct. Presumably, though, the Commissioner does have authority to investigate a claim that insurers are refusing to write policies on the basis of race or any other *prohibited* classification, pursuant to Insurance Code section 11628. We also note that under Insurance Code section 657, an applicant who is denied coverage by an insurer is entitled to a statement of reasons from the insurer as to why the application was rejected.

Code, tit. 10, ch. 5, subch. 3, art. 8, § 2430.)[3] All insurers are required to participate in the program. (Ins. Code, § 11620.) CAARP offers the statutorily required minimum insurance plus optional medical and uninsured motorist coverage. (CAARP, §§ 2406-2408.)

The CAARP rates are set by the Commissioner after public hearings, and are based on a number of classifications (including geographical area). There is a rate differential of $600 between drivers with no accidents or traffic violations in the last three years and those with twelve or more "points" during that period.[4] (Prior to 1987, the differential was $200.) Under CAARP, the highest annual premium for "good drivers" (i.e., those with zero points) is for youthful drivers in the highest rated geographic areas (e.g., South Central Los Angeles). The annual premium for these drivers is $662. For adult drivers in the highest rated geographic area who have zero points, the annual premium is $516. CAARP provides that the premium can be paid in five installments provided a 25 percent deposit is made. In order to use the installment plan an additional $2 fee per installment is charged. (CAARP, § 2443.1.)

In most parts of the state, CAARP rates are higher than those offered by voluntary insurers. However, in certain areas, including the area in which all plaintiffs reside (South Central Los Angeles), CAARP is allegedly less expensive than non-CAARP insurance. It appears that statewide, approximately 35 percent of those with CAARP insurance are drivers with no points.

Being placed with CAARP is really a "nondecision." That is, no entity "decides" to place a driver in the program. Rather, placement in the plan results as a condition of being "unable to procure [insurance] through ordinary means." The inability to procure insurance by ordinary means is, of course, the result of determinations made by individual insurers to refuse to provide coverage to the driver in question. Hence, eligibility for CAARP is not reviewable because there is no decision to review.

---

[3] All Administrative Code references are to this article, and are hereinafter denominated CAARP followed by the relevant section number.

[4] Points are accumulated based on accidents and vehicular offenses. For example, a first moving violation is generally assigned one point, although a serious moving violation is valued at four points. An accident causing bodily injury or over $250 in property damage is worth two points. Three years is the maximum permissible period for consideration of such an event under the CAARP penalty point system. (CAARP, § 2460.3(a).)

## II. *Factual and Procedural Background of this Litigation*

The individual named plaintiffs in this action are seven residents of South Central Los Angeles.[5] At the time this action was filed, they ranged in age from 19 to 73. Most were retired or unemployed, but one was employed and earning $17,000 a year. Some suffered from medical disabilities (none of which precluded driving), and some relied on driving to go to and from work or to the doctor. Some had been insured in the recent but not immediate past, while others had not been insured.

Despite the above differences, all of the named plaintiffs shared some common characteristics. As previously noted, all lived in South Central Los Angeles. None of them had been involved in an accident or had a traffic violation within the last three years or since they started driving.[6] All have had difficulty finding insurers willing to issue them a policy, and none had found private insurance at premiums below those offered by CAARP. Plaintiffs felt that it was unfair to lump them with bad drivers for insurance purposes notwithstanding their clean driving records, and to be charged correspondingly higher premiums as a result. Many could not afford insurance even under the CAARP or would have difficulty paying the CAARP premiums.

The action was brought on behalf of the named plaintiffs and "all others similarly situated," specifically, licensed drivers who do not have the required "insurance or proof of insurance" and "all who have been fined or lost their licenses" pursuant to Vehicle Code section 16034. The class has not been certified.

The defendants are (in their official capacities) George Meese, former Director of the DMV, James Smith, Commissioner of the California Highway Patrol, John Van De Kamp, Attorney General, and Sherman Block, Sheriff of Los Angeles County. Neither the Commissioner nor any private insurer has been named a party defendant in the action.

Plaintiffs filed their complaint on Friday September 13, 1985, and requested a temporary restraining order enjoining the operation of the 1984

---

[5] The eighth named plaintiff is the United Front Against Insurance Discrimination, a coalition of organizations "to fight automobile insurance discrimination against residents of Los Angeles."

[6] Three years is the length of time that the DMV is generally required to retain data concerning a driver's accidents or traffic infractions. (Veh. Code, §§ 1807, 12810.5.) Most plaintiffs have been "clean" drivers for significantly longer than three years.

Act. The trial court refused to issue the restraining order, but set a hearing date for plaintiffs' motion for a preliminary injunction.

In support of their motion for preliminary injunction, plaintiffs submitted a number of declarations and exhibits.[7] This evidence tended to establish that the level of competition among automobile insurers found elsewhere in the state was lacking in South Central Los Angeles. Most "mainstream" insurers were allegedly refusing to write policies in that area, or would only insure those who already had insurance. Many of the insurers who did offer insurance for the area were said to be "sub-standard," that is, they specialized in high risk customers and hence charged the highest rates. Insurance by mail was also available, but plaintiffs did not discuss this option except to note that such companies "provide no service through agents or offices for acquiring insurance, servicing policies, or handling claims."

Defendants submitted no evidence in opposition to plaintiffs' motion. However, this court may (as did the trial court) infer from enactment of the 1984 Act itself that the Legislature had determined that substantial harm was being caused by uninsured drivers, especially if their victims were not themselves insured.

The trial court denied plaintiffs' motion, finding that a balance of hardships favored defendants. Plaintiffs then petitioned the Court of Appeal for supersedeas. That court denied the petition. We granted the subsequent petition to this court for review, and stayed enforcement of the 1984 Act. We also transferred the appeal, then pending before the Court of Appeal, to this court.

### III. *The Questions Presented*

The scope of our task is greatly narrowed not only by the limited attack made by plaintiffs, but also by the various concessions made by defendants. First and foremost, plaintiffs have expressly and repeatedly confined themselves to two main legal theories: (1) By providing no mechanism whereby a driver can question and challenge (a) an insurer's decision not to issue a policy or (b) the rate thereof, and by effectively making the ability to drive contingent on having insurance, the state is denying drivers procedural due process of law; and (2) By effectively requiring drivers to carry insurance, by allowing insurers to decide who will or will not be able to obtain private insurance, and by failing to provide adequate guidelines to insurers in mak-

---

[7] In view of the remainder of our opinion, we do not address defendants' objections to the proffered evidence.

ing their decision, the Legislature has unconstitutionally delegated its authority to insurers.[8]

Similarly, defendants also concentrate on two major points. First, they contend that since the appeal is from a denial of a preliminary injunction we can affirm the trial court solely by balancing the equities without reaching the merits of plaintiffs' claims. Second, they argue that even if we reach the merits and find that there is a procedural due process interest involved, CAARP meets all constitutional standards, and hence the 1984 Act is constitutional.[9]

As defendants correctly note, at this stage of the proceedings, i.e., denial of a preliminary injunction, the trial court must be affirmed unless it abused its discretion in making its determination. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) In exercising its discretion, the trial court must consider "two interrelated factors," specifically, the likelihood that plaintiffs will prevail on the merits at trial, and the comparative harm to be suffered by plaintiffs if the injunction does not issue against the harm to be suffered by defendants (or in this case the people of the State of California) if it does. (*Id*. at pp. 69-70.)

Although there is no data quantifying the harm to be caused by issuing the injunction, there is no doubt that the victims of accidents caused by uninsured drivers suffer greatly, especially if these victims do not themselves have medical or uninsured motorist coverage. Against that unquantified harm, the trial court weighed the effect of the law on plaintiffs. Many members of the putative class were undoubtedly faced with fines and threatened with or actually subjected to suspension of their licenses.[10] Without

---

[8] Plaintiffs do not attack the pre-1984 financial responsibility laws, nor do they contend that the 1984 Act denies them substantive due process or equal protection. Moreover, plaintiffs do not allege that the Commissioner is improperly carrying out his duties or that any insurer is failing to comply with the law. We also note that plaintiffs do not argue that private insurance rates are actually "excessive" in violation of Insurance Code section 1852. Plaintiffs assert that even if the Commissioner and various insurers had been joined as defendants, and even if we found plaintiffs' legal propositions persuasive, we would be without power to remedy the situation through a decree directed at the Commissioner or any insurer.

[9] For their part, defendants do not strongly argue that the state has no responsibility or duty to provide access by all to insurance at rates set in a constitutionally permissible manner (i.e., neither arbitrarily nor capriciously). They do strongly maintain, however, that private insurers do not constitute an arm of the state, and their acts are not "state acts" cognizable under the Fourteenth Amendment to the United States Constitution or article I, section 7 of the California Constitution.

[10] We note that the statistics quoted by plaintiffs as establishing the number of citations issued under the 1984 Act prior to the trial court's hearing did not differentiate between those who could not afford or could not obtain insurance, and those who simply would not buy it even if they could afford it.

considering the merits, the trial court found that the balance of hardships favored defendants, and therefore denied the injunction.

In doing so, the trial court considered the reasoning of the Michigan Supreme Court in *Shavers* v. *Kelly* (1978) 267 N.W.2d 72 [267 N.W.2d. 72]. That case raised similar issues to those raised here, and is discussed in detail *infra*. At this point it is necessary only to point out that the Michigan court agreed with plaintiffs' legal position but stayed the effect of its decision for 18 months so that the Legislature could enact appropriate corrective legislation. Inferentially, then, even after the plaintiffs in that case won on the merits the Michigan court must have found that a balance of hardships favored defendants.

However, the procedural posture in *Shavers* is strikingly different from that in the instant case. In *Shavers,* the law in question, a no-fault plan which effectively required all drivers to carry insurance, had been in effect, and enforced, for four and one-half years. For the Michigan court to enjoin enforcement would therefore have *changed* the status quo. In contrast, the 1984 Act had only been in effect for a short time when the trial court heard the preliminary injunction motion. Hence, in the case at bench, an injunction would have *maintained* the status quo. We therefore conclude that reference to *Shavers* is of limited value with regard to a balancing-of-hardships analysis.

We conclude that the trial court did not err insofar as it found that the balance-of-hardships analysis favored defendants. However, as previously stated, the trial court must also consider the likelihood of plaintiffs' ultimate success on the merits in determining whether to issue a preliminary injunction. Although consideration of this issue does not entail final adjudication of the ultimate rights in controversy (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840]), it does affect the showing necessary to a balancing-of-hardships analysis. That is, the more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue. This is especially true when the requested injunction maintains, rather than alters, the status quo. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].) We believe it is the mix of these factors that guides the trial court in its exercise of discretion.

■ On review, a trial court's order with regard to a preliminary injunction may be affirmed if either the balance-of-hardships analysis or plaintiffs' likelihood of success considerations would alone support the ruling. (*Cohen, supra,* 40 Cal.3d at pp. 286-287.) However, if the trial court relies on but one of the foregoing, the reviewing court must determine whether that

reliance conclusively supports the trial court's determination regardless of the remaining considerations.

Although the balance of hardships favors defendants in this case, we cannot say that it tilts so sharply in their favor that it supports the trial court's order irrespective of the likelihood of plaintiffs' success on the merits, especially where, as here, the trial court's order denying the motion had the effect of altering the status quo. Normally, it would be appropriate to remand the case to the trial court for consideration of the latter question. However, plaintiffs have argued, and we agree, that there exist no contested factual questions necessary to resolve the case. In addition, the legal issues have been exhaustively briefed by the parties and numerous amici. In light of these factors and the importance of the case, we take the unusual, but practical, step of reaching and resolving the merits ourselves.

## IV.  *Discussion*

### A.  *Procedural Due Process.*

■ It is well established in California that the privileges conferred by a driver's license constitute an important property right (*Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979]; *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586]), although not so fundamental a right as to trigger a strict scrutiny analysis (*Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70 [177 Cal.Rptr. 566, 634 P.2d 917]). It is equally clear that before any criminal sanction is imposed for failure to establish financial responsibility, such as a fine, the state must comply with a panoply of procedures. Moreover, under the 1984 Act, a license can be suspended only after such an adjudication. Hence, at one level, there is ample "due process" before any sanctions are imposed for lack of financial responsibility.

But it is plaintiffs' contention that the foregoing process comes too late. The critical moment, according to plaintiffs' theory, occurs when they attempt to obtain insurance from the private insurance market and are unable to do so.  ■  Plaintiffs assert that they have a substantive right either to participate in the private insurance market or to obtain coverage from the private insurance market and it is this right which cannot be impaired without procedural protection. Plaintiffs contend they have a procedural due process right to examine and challenge the decisionmaking process of private insurers.

Plaintiffs' position finds support in *Shavers* v. *Kelly, supra,* 267 N.W.2d 72. In *Shavers,* the Michigan Supreme Court reviewed a legislatively enact-

ed no fault insurance law, which required all drivers to establish their financial responsibility in order to register or operate a motor vehicle. In most other respects, the legislative framework encompassing financial responsibility and insurance regulation was generally similar to that now in place in California.[11] Michigan also had a program similar in many respects to CAARP.

The *Shavers* court began its consideration by holding that insurers were instruments of the state in carrying out Michigan's no-fault policy, and hence acts by insurers were state acts. Since drivers had a right not to be arbitrarily or capriciously denied by state actions the state-mandated insurance (at fair and equitable rates), the court held that procedural due process was required. At a minimum, that required the state to provide a meaningful way for drivers to challenge an insurer's coverage or rate-setting decision. The court also went on to consider the effect of the Michigan assigned risk program, but concluded that the program did not cure the constitutional infirmity.

Although defendants in the instant case attempt to distinguish *Shavers,* there is no reasoned way to do so. Thus, if we applied the reasoning of that case here, we would be compelled to find that plaintiffs would likely prevail on the merits. However, we are not persuaded by the reasoning in *Shavers,* and decline to follow that case in two crucial respects. First, we cannot agree that the acts of private insurers in setting rates or denying coverage are state acts. Second, because of the foregoing, we cannot concur in the Michigan court's summary consideration and rejection of the assigned risk program as a constitutional alternative to meeting due process requirements.

We turn first to the state-action question. We have never held that a private company in a competitive industry is a state agent, or that its decisions on how to price and market its product constituted state action. To the contrary, only in extreme cases of pervasive state regulation coupled with a state-guaranteed monopoly have we equated private decisions with state action.[12]

---

[11] However, unlike California, Michigan required that all insurance rates be approved by its insurance commissioner.

[12] See *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592]. In *Gay Law Students,* we found that a public utility is more akin to a governmental entity than a purely private employer. As factors leading to that conclusion, we noted the following: "[B]readth and depth" of governmental regulation; a regulatory framework establishing that the state "expects" a utility to act like a governmental entity, not a private corporation; the fact that the prices charged for the utility and the standards of the facilities were determined by the state; the endowment of the utility with a number of the state's sovereign powers; the guaranteed monopoly status of the utility; the guaranteed return on in-

There are many products and services the use of which is obligatory to the enjoyment of a state-protected property right, such as fire extinguishers for buildings, or smog control devices or mufflers for cars. The state generally should be able to rely on such products to be supplied by the marketplace, and the suppliers should not become state agents on the ground that state law has created or expanded the demand for their product or mandated its use. Rather, it is only when state law encourages the decision-making procedure in question, or when a statute permits that which had been prohibited by common law, that the decisions of private parties can potentially be considered state actions. (See *Garfinkle* v. *Superior Court* (1978) 21 Cal.3d 265, 278-279 [146 Cal.Rptr. 208, 578 P.2d 925] [holding that nonjudicial foreclosure is not state action despite its statutory authorization]; *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 361-362 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266] [refusing to find that the action of a bank in asserting a statutory right of setoff constituted state action].)

Even though the acts of insurers in setting rates and their decisions whether to provide coverage are not state actions, as we have already stated the state's decision to impose a fine or suspend a license is a state action. We must, therefore, consider what process is due to insure that this limited state action is not performed arbitrarily or capriciously.

Plaintiffs contend that the only way to guarantee access to insurance, at "fair and equitable" rates (although not necessarily affordable rates[13]), is to provide the procedural process they request. Defendants do not strongly challenge plaintiffs' contention that by effectively requiring drivers to carry insurance, the state may have a duty to make insurance available to drivers in a manner that is neither arbitrary nor capricious.[14] However, they argue that one way to meet that duty is through the CAARP. We agree.

We are persuaded that we must look to the CAARP in deciding whether the 1984 Act comports with procedural due process. As part of our analysis, we take note of the assessment by the *Shavers* court of Michigan's Assigned Risk program. That court identified three problems: (1) there was a "statutory presumption that the rates charged will be higher than the

vestment; and the public's need to purchase the monopolistic utility's product. (*Id.* at pp. 469-472.) Insurance companies might possess only the last of the foregoing attributes: the public's need to buy the product. Without more, that does not approach the situation described in *Gay Law Students.*

[13] Plaintiffs have conceded that if after a due process hearing the same rates were approved as are now in effect, they would have no remedy.

[14] We did not reach this issue in *Watson, supra,* 212 Cal. 279, which concerned a substantive due process challenge to the financial responsibility laws, and plaintiffs do not quarrel with the result in that case.

rates for motorists in the open marketplace. M.C.L. § 500.3365; M.S.A. § 24.13365." (267 N.W.2d at p. 89.); (2) the rates set by the program were subject to the same procedural and substantive inadequacies as those found in the private market; and (3) there was no way to challenge placement in the program "with its presumptively higher rates." (*Ibid.*) Having recited these problems, the court summarily concluded that the program was inadequate to meet due process requirements.

We cannot dispose of CAARP as easily. In determining whether procedural due process is afforded plaintiffs, it is axiomatic that we look only to the asserted state duty and cognizable state action. (See *Garfinkle, supra,* 21 Cal.3d at pp. 281-282; *Kruger, supra,* 11 Cal.3d at pp. 366-367.)[15] Thus, if the state provides a program to satisfy its duty, and that program is procedurally adequate, then the "state action" is constitutional. Inasmuch as we have determined (contrary to the *Shavers* court) that the acts of private insurers do not constitute state actions, we need not consider CAARP in relation to private insurance. Rather, we must look to CAARP standing alone to determine whether it meets the required procedural due process standards.

In our judgment, CAARP effectively guarantees that insurance is offered and available to all eligible drivers in the state. Further, CAARP requires the program's rates to be set by the Commissioner after public hearings. (Ins. Code, § 11620, CAARP, § 2404.) Thus, a plan is in place to meet the state's asserted duty, and the plan is, on its face, procedurally sound. The burden is therefore squarely on the plaintiffs to establish an infirmity in CAARP. In attempting to meet that burden, plaintiffs put forth five arguments (including the three mentioned in *Shavers*). We ultimately conclude that none has merit.

First, plaintiffs allege that CAARP was originally designed to be used by bad drivers. As a consequence, plaintiffs assert that CAARP rates are "presumptively" higher than those of private insurers.[16] In support, they point to

[15] Plaintiffs cite *Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 657 [163 Cal.Rptr. 831], for the proposition that private enterprises affected with a public interest must provide "fair procedures," a notion akin to due process. However, that case and the law review article upon which it relies make it clear that "fair procedures" extend only to membership decisions of work-related entities, such as unions or professional organizations. The only exception is that the doctrine has been extended to a hospital's decisions concerning a doctor's staff privileges. (Sloss & Becker, *The Organization Affected With a Public Interest and Its Members—Justice Tobriner's Contribution to Evolving Common Law Doctrine* (1977) 29 Hastings L.J. 99.) *Applebaum* has no application to this case.

[16] We note, though, that there is certainly no "statutory presumption" in California that CAARP rates are higher than those in the voluntary market, in contrast to the described situation in Michigan.

the hearsay words of an official in the Commissioner's office: if CAARP rates are lower than those of private insurers, "something is wrong."

Defendants dispute the accuracy of plaintiffs' premise, but either way it is agreed that 35 percent of those insured through CAARP are drivers with no points and hence are presumptively good drivers. Because of the number of good drivers in the program, CAARP premiums significantly differentiate between drivers with no points and others.[17] (CAARP, § 2460.3 subd. (g).) In addition, even if "something is wrong," as plaintiffs assert, their remedy is through the Commissioner, who may investigate private insurance rates to determine if they are "excessive" or revise the rates set in CAARP. Plaintiffs have made some showing that a "reasonable degree of competition does not exist in [South Central Los Angeles] with respect to the classification to which such rate is applicable." (Ins. Code, § 1852.) That is half of the necessary statutory showing required to obtain relief from the Commissioner.[18]

Second, plaintiffs claim that CAARP "stigmatizes the driver vis-à-vis future insurance opportunities." The only evidence on point is a declaration by an experienced, licensed insurance agent who serves the South Central Los Angeles community. However, that declaration does not show that, for purposes of future insurance opportunities, an insurer treats a CAARP driver any differently from a previously uninsured driver.[19] Therefore, we cannot find that CAARP results in unconstitutional state-mandated stigmatization.

---

[17] In his March 20, 1986, decision, the Commissioner explained that a recent change in the CAARP regulations was designed "to double the premium surcharges [of drivers with points] in order to place the increasing costs of liability insurance on the negligent automobile operator who has documented traffic violations. This change is also necessary to reflect inflation because these fixed surcharges haven't been changed in past years when the base rates were increased." This explanation takes into account much of plaintiffs' concern. Before these changes were adopted, base rates, paid by all CAARP insureds, increased although the dollar differentiation between "good" and "bad" drivers remained constant. In effect, the percentage differential between such drivers decreased each time that the base rates increased. The prior $200 spread between the best and worst drivers did not fully reflect the actuarial difference in the cost of insurance between them. Hence, plaintiffs were correct in asserting that good drivers in CAARP subsidized bad drivers. That concern now has less persuasive force.

[18] As plaintiffs have not filed a complaint with the Commissioner, nor joined him in the present case, we cannot determine whether the rates are actually excessive. We note, though, that such a claim was made in a complaint filed with the Commissioner by the County of Los Angeles. Plaintiffs here are, of course, also free to file a complaint. As stated previously, the Commissioner's final determination is subject to judicial review.

[19] One plaintiff, in his declaration, states that he believes it is "unfair" for him to be placed in CAARP, where he claims he is "lumped with bad drivers," just because of where he lives. This argument was not set forth in plaintiffs' brief as evidence of "stigmatization." Moreover, as plaintiffs themselves point out, 35 percent of those insured through CAARP are good drivers. Given the differentiation in rates based on driving record, and the foregoing statistic, it cannot be said that this declaration, if true, establishes stigmatization.

Third, plaintiffs complain that they cannot challenge CAARP rates, another concern of the *Shavers* court. This is true on an individual premium basis at the time of application. However, unlike private insurance rate-setting systems, CAARP rate criteria are set out publicly, so the application of rate classification to an individual premium is a ministerial task and easily verified by the applicant. On a larger scale, rates are set periodically by the Commissioner after public hearings.[20] Consequently, ample process is afforded with regard to CAARP rates and premiums.

Fourth, plaintiffs note that coverage under the CAARP is limited and they cannot choose their carrier. If they desire additional insurance, they must take out a separate and allegedly expensive supplemental policy with another insurer. Even if true, this additional insurance is not required by law, and so the need to obtain it is purely self-imposed. Further, plaintiffs specify no reason, and we can discern none, why the inability to choose a particular insurer renders CAARP constitutionally infirm. This allegation therefore can have no effect on plaintiffs' constitutional challenge.

Finally, as in *Shavers,* plaintiffs complain that they cannot challenge their placement in CAARP. But as we noted earlier, there is no single decision consigning someone to that program; only individual decisions of insurers to refuse to insure, or to charge rates that the applicant finds unacceptable. Thus, plaintiffs' objection is not to CAARP as such, but to the Commissioner's failure to police the insuring decisions and rate schedules of the private insurers.

In sum, because the acts of private insurers do not constitute state actions, plaintiffs have no procedural due process right to review or challenge an insurer's decision concerning the denial of coverage or the premiums charged. Although state action is involved in the suspension of a license or the imposition of a fine for failure to establish financial responsibility, the scope of the state's alleged duty can at most extend to a duty to provide plaintiffs with the required amount of insurance at rates that are neither arbitrary nor capricious. We therefore conclude that CAARP provides the required access to insurance in a manner that comports with procedural due process.

B.  *Delegation of Power.*

Plaintiffs' second argument is dealt with more easily.  ■  They contend that the current regulatory structure in California constitutes a delega-

---

[20] Plaintiffs expressly concede for purposes of this suit the procedural due process adequacy of the CAARP rate-setting procedures.

tion of legislative authority to the private insurance industry, which determines who can purchase insurance (and thus who must resort to CAARP) and what rates they must pay. Such a delegation, plaintiffs maintain, is invalid unless accompanied by clear standards to guide the exercise of the delegated power, and adequate safeguards to limit the exercise of discretion.

However, the great weight of California authority has found a delegation of legislative power to industrial or professional associations only where statutes gave such groups the power to initiate or enact rules that acquired the force of law.[21] Other decisionmaking authority, even if the decision had a significant impact on a person's daily life, has not constituted a delegation.

The exception to the rule is *Rosner v. Peninsula Hospital Dist.* (1964) 224 Cal.App.2d 115 [36 Cal.Rptr. 332]. In *Rosner,* a hospital adopted an emergency resolution requiring all staff doctors to carry malpractice insurance, and refused staff privileges to Dr. Rosner because he lacked such coverage. The Court of Appeal struck the resolution because it effectively delegated the determination of who could obtain staff privileges to the insurance industry, and it did so without providing adequate safeguards or standards. However, *Rosner* was rejected in a later Court of Appeal decision also concerning a requirement that all staff doctors carry medical malpractice insurance. (*Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436 [192 Cal.Rptr. 593].) The *Wilkinson* court, relying on our post-*Rosner* decision in *Wilke & Holzheiser, Inc., supra,* 65 Cal.2d 349, held that the purported delegation was really no delegation at all. Insurance companies had always been entitled to determine who they would insure. The hospital's rule in no way "authorized a private entity to do anything other than what it was already entitled to do." (144 Cal.App.3d at pp. 445-446.)

We adhere to the longstanding rule that a statute does not delegate legislative authority to a private industry unless it empowers that industry to initiate or enact rules that have legal force. A statute that merely permits

---

[21] See e.g., *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431] (Forest Practice Act resulted in an unconstitutional delegation-of-power because an industry committee was empowered to initiate rules that governed all lumbering in a region, preempting county regulation); *State Board v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29] (striking down, in part on a delegation of power theory, legislation authorizing a professional organization to set minimum prices binding upon all members of the profession); *Allen v. California Board of Barber Examiners* (1972) 25 Cal.App.3d 1014 [102 Cal.Rptr. 368, 54 A.L.R.3d 910] (same); *Wilke & Holzheiser, Inc. v. Dept. of Alcoholic Beverage Control* (1966) 65 Cal.2d 349 [55 Cal.Rptr. 23, 420 P.2d 735], result overruled on other grounds in *Rice v. Alcoholic Bev. etc. Control Appeals Bd.* (1978) 21 Cal.3d 431 [146 Cal.Rptr. 585, 579 P.2d 476, 96 A.L.R.3d 613] (fair trade laws upheld against delegation-of-power challenge because prices were set by individual distillers, not by industry association, and were enforced by contract).

a private seller to decide to whom to sell, and at what price, is not unconstitutional.[22]

## V. *Conclusion*

We conclude that the 1984 Act comports with all procedural due process and delegation-of-power requirements. Therefore, plaintiffs are not likely to prevail on the merits, and the trial court's decision to deny the motion for a preliminary injunction must be affirmed.

In reaching this conclusion, we are not insensitive to plaintiffs' position. There is a certain appeal to plaintiffs' complaint that those with good driving records, who could possibly afford insurance if they lived in a more affluent area, are unable to obtain insurance in the area where they actually live. As a consequence, they face relatively heavy fines and suspended licenses for a traffic infraction that would otherwise be but a minor annoyance. There is also some persuasive force to plaintiffs' concern that the lack of procedural safeguards in the area of private insurance, which might provide a guaranty that such insurance is offered at fair and equitable rates, leads to a feeling of helplessness among those unable to afford or obtain private insurance. However, their case should be made to the Legislature, not to this court. So long as the legislatively mandated system meets minimum procedural due process standards, as we found it does, we cannot look behind the enacted framework to replace the Legislature's social judgment with our own. To do so would be an egregious violation of the separation of powers.

Our order of December 5, 1985, enjoining enforcement of the provisions of Vehicle Code sections 16028 through 16035 is vacated. The order of the trial court denying the motion for a preliminary injunction is affirmed. The case is remanded for further proceedings consistent with the foregoing opinion.

Lucas, C. J., Arguelles, J., Kaufman, J., and Feinerman, (Robert), J.,* concurred.

**BROUSSARD, J.**—I reluctantly concur in the judgment sustaining the trial court's ruling denying a preliminary injunction to restrain enforcement of the 1984 legislation (Veh. Code, §§ 16028-16035) providing that a driver cited for a moving violation must provide proof that he has automobile liability insurance. When we granted review, we saw this case as raising two

---

[22] To the extent that *Rosner* is inconsistent with the foregoing, it is disapproved.

* Presiding Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

significant constitutional issues: (1) whether the state, having effectively made automobile liability insurance compulsory, had a duty to assure that such insurance was available to all its drivers at reasonable and nondiscriminatory rates[1]; and (2) if so, whether the state's statutory and administrative scheme fulfilled that duty. But a funny thing happened on the way to this forum. The state did not dispute its duty to assure that insurance was available to all on a fair and reasonable basis.[2] Instead, it maintained that the California Automobile Assigned Risk Plan (CAARP) fulfilled that obligation. And plaintiffs, on their part, made no attempt to show that insurance was not available under CAARP on a fair and reasonable basis, and in response to our questions disclaimed any notion that affordability was something to be considered in assessing the reasonableness of insurance rates.

Instead, it turned out that plaintiffs' attack on CAARP was based entirely on popular but mistaken notions concerning the assigned risk program. Plaintiffs assert that CAARP was intended only for drivers with bad records,[3] when in fact it serves the broader purpose of making insurance available to anyone who, for any reason, cannot obtain private insurance at lower rates. They assume that, as persons with good driving records, they were mistakenly relegated to CAARP, and seek to challenge the decision which assigned them to that fate. In fact, there is no such decision; drivers turn to CAARP when they discover that private insurance is not available, or costs more than CAARP insurance. Finally, plaintiffs assume that their CAARP rates are unfairly high because they are calculated on the basis of a pool containing primarily drivers with bad records. But CAARP charges lower rates for drivers with good records. If the rate differential is inadequate, that issue can be raised in rate-making proceedings before the Insurance Commissioner (Commissioner) and on judicial review of those proceedings.

The failure of plaintiffs' attack on CAARP dooms their request for a preliminary injunction, and requires us to affirm the ruling below. But that

[1] In *Shavers* v. *Kelley* (1978) 402 Mich. 554 [267 N.W.2d. 72], the Michigan Supreme Court held that "[m]otorists are constitutionally entitled to have . . . insurance made available on a fair and equitable basis."

[2] Every state which has enacted compulsory automobile insurance laws (whether liability insurance or no fault insurance) has also enacted procedures for review of private insurance rates, an assigned risk program, or both. Most states go further, requiring advance approval of insurance rates by an insurance commissioner or board, but there appear to be none which do not recognize the obligation to make sure that insurance is available to those required to possess it.

[3] This claim, while plausible on its face, may be historically inaccurate. According to *Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 880-881 [216 P.2d 882], the impetus for the current assigned risk program was the refusal of insurance companies to insure small trucking companies regardless of their accident record.

outcome for the present appeal leaves a great many unanswered questions. Since this case remains subject to further proceedings in the trial court, and the matter is one of legislative and public concern, I think it appropriate to note some of those questions.

(1) *Factual Background of this Litigation*

This case arises from the attempt of the California Legislature to solve a serious social problem—the uninsured driver—without taking into account an equally serious problem—insurance pricing practices which make automobile liability insurance prohibitively expensive for many of the urban poor. The 1984 Legislature enacted Vehicle Code sections 16028 through 16035, which provide that whenever a driver is cited for a moving violation, he must provide proof of financial responsibility upon request of the citing officer. Violators are subject to a fine of $100 to $240 and penalty. The Department of Motor Vehicles (hereafter DMV or department) is notified of the conviction, and must suspend the violator's driving privileges unless, within 60 days, he provides proof of financial responsibility. Although statutes provide alternative methods of demonstrating financial responsibility,[4] the only practical method is purchase of an insurance policy with liability coverage equal to or greater than the statutory minimum.[5]

Since previous California law required proof of financial responsibility only after an accident, the new statute radically accelerated the enforcement of the financial responsibility requirements, increasing substantially the number of persons facing revocation of their licenses for noncompliance with those laws. Purchase of liability insurance became a necessity for all drivers, even those with no personal assets to protect.

But as insurance became essential, for many people it was also becoming more difficult to obtain. Private insurance companies were increasingly unwilling to sell liability coverage, at least at affordable rates, to residents of South Central Los Angeles and portions of Oakland.[6] Often a resident of

---

[4] The other forms of proof may be found in Vehicle Code sections 16053 (certificate of self insurance); 16054 (insurance policy or bond); 16054.2, subdivision (a) (cash deposit of $50,000 with the DMV). The certificate of self insurance can only be issued to fleet owners of more than 25 vehicles. (§ 16053, subd. (a).) The bond mentioned in section 16054, subdivision (a) is not in fact sold by any surety in the state. It is self-evident that a person who cannot afford to pay the several hundred dollars required for minimum liability insurance is equally unable to deposit $50,000 in cash with the DMV as required by section 16054.2, subdivision (a). Accordingly, purchase of an automobile insurance liability policy is, in fact, compulsory.

[5] The minimum insurance currently required is $15,000 liability coverage per person injured, $50,000 per accident, and $5,000 for property damage. (Veh. Code, § 16056, subd. (a).)

[6] The individual plaintiffs in the present case all reside in South Central Los Angeles, and the evidentiary record on which they base their motion for preliminary injunction refers to

those areas with a perfect driving record could obtain private coverage, if at all, only by paying more than a resident of some other areas with a history of accidents and violations.[7] The 1984 legislation did nothing to correct this problem.

The individual plaintiffs here are seven residents of South Central Los Angeles. Each has submitted declarations in support of plaintiffs' motion for a preliminary injunction; these declarations, collectively, explain the circumstances which gave rise to this action.[8]

Plaintiff Benita Hill, 28 years old, states that she is unable to work because of a medical condition (lupus) and must drive to medical appointments. She has never received a traffic ticket or been in an accident. Her monthly income is $485. When she sought private insurance, companies quoted annual rates of $1,050 to $1,400, far beyond what she could afford.

Plaintiff Lorene Dilworth, age 69, has had 1 accident, but no traffic tickets. She lives with her son V. La Val Dilworth, age 19, who has a completely clean driving record. He supports them both with a job paying $6.54 per hour. The California Automobile Association presented the best offer of any private insurance company, $2,634 cash or $3,030 on an installment basis to insure the Dilworths' two cars.

Willie Henry, age 73, has had no tickets or accidents for the past 10 years. His income is under $500 per month. Most companies would not insure him because he had been driving without insurance until the present law went into effect. (One company offered coverage at $1,200.) He discovered he could obtain assigned risk coverage at $481 per year, but cannot afford it as this is equal to one month's income.[9]

that area. Statewide information on insurance rates, however, suggests that the problem of obtaining insurance at affordable rates exists in portions of Oakland, and probably in other low-income urban areas.

[7] For discussion of a similar problem involving property insurance, see Note, *Property Insurance and the American Ghetto: A Study in Social Irresponsibility* (1971) 44 So. Cal.L.Rev. 218.

[8] The declarations refer to insurance rates as of 1985; current rates are generally higher and the magnitude of the problem has, if anything, become worse. (See Dept. Ins. Auto Ins. Premium Survey (July 15, 1987).) The survey gave the example of a policy providing minimum coverage issued to a 45-year-old married couple with clean driving records. Such a policy would cost from $750 to $1,500 in South Central Los Angeles (an average of about $1,000). It would cost from $250 to $400 in San Diego, and from $150 to $300 in Redding.

[9] As of 1985, $481 was the lowest assigned risk rate available for this territory. (Current rates are higher.) It applied to males over 25, or females over 21, who do not use their car to drive to work, and have a completely clean driving record. It is possible that some other plaintiffs could have obtained assigned risk policies for $481, far less than the private rates recited in their declarations.

Lawrence Wiley is retired on an income of $996 per month. He has had no tickets in the last five years and no accidents. He was unable to get private coverage, and will be forced to purchase an assigned risk policy at $648 to $731.

The declarations of other plaintiffs recite similar facts. They demonstrate that residents of South Central Los Angeles, even those with good driving records, have considerable difficulty obtaining private insurance coverage. When such coverage is available, the price quoted is very high, much higher than prices for other parts of the state, and often far beyond the means of the applicant. Thus applicants must resort to the assigned risk program, but those rates, while less than private rates, are still prohibitive to many applicants.[10]

Further evidence supports this conclusion. The ruling of the Commissioner on assigned risk rates, filed March 20, 1986, observes that "[f]or a variety of reasons, these are difficult times for some of the insurance companies with respect to the willingness to offer basic automobile liability insurance, particularly in the urban areas. Some agent appointments are being terminated, underwriting standards have been tightened, and some premium rates have increased." Plaintiffs' counsel submitted a declaration quoting Everett Brookhard, chief of the Consumer Affairs Division of the California Department of Insurance: "The biggest problem in South Central Los Angeles is the lack of a competitive market. The distribution system for insurance sales is not there, especially for the large direct sales companies such as Allstate, State Farm and Farmers insurance companies. While a number of companies may actually quote rates for South Central Los Angeles, many fewer of them were actually doing business there, that is writing policies for South Central Los Angeles residents. They might have rates, but there are no agents authorized to write the policies, nor are the distribution or claims systems there to service the customers. Additionally, even if they published rates, they often impose so many restrictions (e.g., no prior insurance precludes application), that the insurance quoted at those rates is inaccessible. A 'high percentage' of drivers in South Central Los Angeles are uninsured."

Morris Davis, an insurance agent with offices in South Central Los Angeles, declared: "Currently, out of over 400 insurance companies doing business in California, I only know of approximately 10 who will write liability insurance policies through local agents and brokers for customers whose

---

[10] Typically, assigned risk rates are much higher than private rates. The converse situation in South Central Los Angeles arises not because assigned risk rates are low for that region—to the contrary, that territory has the highest assigned risk rates—but because the territorial differences in assigned risk rates are much less than the territorial differences in private rates.

vehicles are registered in south central Los Angeles. And, of these companies, virtually all are insurance companies denominated as 'sub-standard.' This means that these companies specifically write for customers who are perceived to be the greatest risk, that is, 'sub-standard' customers, and therefore these companies charge the highest rates. Customers residing in south central Los Angeles, especially in certain zip codes, are stigmatized as 'sub-standard' risks, even if they've had no moving violations and no accidents."[11]

A number of exhibits verify that private insurance rates in South Central Los Angeles are two to three times as high as rates in other areas of the state, with the result that good driver rates in Los Angeles often exceed rates charged drivers with bad records in other areas.

Davis and others speak also of the reluctance of insurance companies to insure persons who were previously uninsured, a problem of particular concern since the purpose of the 1984 legislation was to compel such persons to obtain insurance. They speak also of the difficulty persons with assigned risk insurance experience in later obtaining private insurance.

(2)  *Regulation of Private Automobile Liability Insurance*

Automobile liability insurance in California is provided primarily by a private, competitive, largely unregulated market. California has less regulation of insurance than any other state, and in California automobile liability insurance is less regulated than most other forms of insurance.

The principal regulatory law, the McBride-Grunsky Regulatory Act of 1947 (Ins. Code, § 1850 et seq.) enacts the minimal regulation required to exempt California insurance from federal antitrust law. It governs all forms of insurance including automobile liability insurance. The principal provision, section 1852, provides that "Rates shall not be excessive or inadequate, as herein defined, nor shall they be unfairly discriminatory. [¶] No rate shall be held to be excessive unless (1) such rate is unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable." No provision defines "unfairly discriminatory" rates. Subdivision (d) permits insurers to classify risks in accord with the probable effect on losses, utilizing "individual experience, location or dispersion of hazard, or any other reasonable considerations."

---

[11] Davis explained that residents can obtain insurance in only three ways, assigned risk, "substandard companies," and insurance by mail. The substandard companies charge more than assigned risk rates. Companies operating by mail "provide no service through agents or offices for acquiring insurance, servicing policies, or handling claims."

A person objecting to a rate or classification can complain to the insurer. (Ins. Code, § 1858.) If dissatisfied with the insurer's action, he can request a hearing before the Commissioner. (*Ibid.*) If the Commissioner believes the complaint states probable cause to find a violation of section 1852, he may hold hearings (§§ 1858.1, 1858.2), render findings (§ 1858.3), and impose sanctions (§ 1858.4).[12] His decisions are subject to judicial review. (Ins. Code, § 1858.6.)

Insurers do not file rates with the Commissioner, nor do rates require his approval. He is forbidden to set or fix rates. (Ins. Code, § 1850.) Rates come to his attention only when, sua sponte or in response to a complaint, the Commissioner requests such information from the insurer. The Commissioner asserts no authority over refusals to insure, and complaints charging that an insurer has unreasonably refused to insure are routinely rejected as raising an issue beyond the Commissioner's jurisdiction.

The declarations on file in this action make it clear that South Central Los Angeles is not a competitive market. Consequently the Commissioner has authority to determine whether rates charged for that area are "unfairly discriminatory" or "unreasonably high." (Ins. Code, § 1852.) Efforts to obtain such a determination, however, have failed. The Commissioner appears to assume that so long as a rate is actuarially sound it cannot be unfairly discriminatory or unreasonably high.[13]

The Commissioner's assumption that an actuarially sound rate is necessarily a fair and reasonable rate is open to challenge. One can argue that it is unfairly discriminatory to use classifications which result in charging good drivers in some areas much more than bad drivers in others parts of the

---

[12] As summarized in *County of Los Angeles* v. *Farmers Ins. Exchange* (1982) 132 Cal.App.3d 77, 87 [182 Cal.Rptr. 879]: "[T]he Commissioner has the power to take corrective action as he deems necessary and proper (Ins. Code, § 1858.3); he can impose a money penalty not to exceed $1,000 for each failure to comply up to a total penalty of and aggregating no more than $30,000 (Ins. Code, § 1858.3); he can issue an order specifying in what respects a violation exists and require compliance within a reasonable time thereafter (Ins. Code, § 1855.3, subds. (b) and (c)); and in addition to the other penalties provided, he may suspend or revoke, in whole or in part, the certificate of authority of an insurer with respect to the class or classes of insurance specified in such order which fails to comply within the time limited by such lawful order of the Commissioner pursuant to section 1858.3. (Ins. Code, § 1858.4.)"

[13] Plaintiffs challenge the insurers' claim that rates in South Central Los Angeles are actuarially sound, contending that so little private insurance is now sold in that area that the insurers' accident and loss computations are not statistically reliable. Indeed, considering the disparity between private rates and assigned risk rates for that region, it is difficult to believe that both are actuarially sound. The question is one which would have to be tested by inquiry into the rates at a trial on the merits. At this stage of the litigation, however, plaintiffs have presented insufficient evidence for us to conclude that the insurers' rates lack actuarial justification.

state; it could be considered unreasonable to price liability insurance at levels many cannot afford. Rates which took affordability into account, and weighted driving record more than residence, would go far to alleviate the problem caused by the financial responsibility laws.[14]

The Commissioner's practices, however, make it difficult for drivers to challenge this assumption. The Commissioner has issued no regulations, and published no decisions, stating explicitly how he or she determines whether a rate is reasonable and nondiscriminatory.[15] Plaintiffs allege that complaints are routinely dismissed without hearing. And the fate of the City of Los Angeles's suit shows that when hearings are held, the result may be a decision unsuitable for judicial review.[16]

---

[14] The fact that current territorial rates may be actuarially justified does not mean that a rate which placed less weight on residence would be unsound, or would be unfair to residents of low-risk territories. As explained by the United States Supreme Court, discussing a company requirement that women pay more into a retirement program because they live longer as a class, "when insurance risks are grouped, the better risks always subsidize the poorer risks. Healthy persons subsidize medical benefits for the less healthy; unmarried workers subsidize the pensions of married workers; persons who eat, drink, or smoke to excess may subsidize pension profits for persons whose habits are more temperate. Treating different classes of risks as though they were the same for purposes of group insurance is a common practice that has never been considered inherently unfair. To insure the flabby and the fit as though they were equivalent risks may be more common than treating men and women alike; but nothing more than habit makes one 'subsidy' seem less fair than the other." (*Los Angeles Dept. of Water & Power* v. *Manhart* (1978) 435 U.S. 702, 710, fns. omitted [55 L.Ed.2d 657, 666-667, 98 S.Ct. 1370].)

[15] In *Shavers* v. *Kelley, supra,* 267 N.W.2d 72, the Michigan Supreme Court found state regulation of automobile insurance rates constitutionally inadequate, in part because "[t]he statutory structure against 'excessive, inadequate or unfairly discriminatory' rates is without the support of clarifying rules established by the Commissioner, with legislatively sufficient definition, and without any history of prior court interpretation." (P. 88.)

[16] In 1978 the County of Los Angeles filed a complaint with the Insurance Commission, charging two insurers with 20 specified unlawful practices relating to territorial classifications. The Commissioner conducted public hearings and reached the following conclusions:

". . . . . . . . . . . . . . .

"2. That the use of territorial classification does constitute a reasonable and credible rating criterion, but that this finding should not be considered a blanket approval of the territorial classification presently used by the insurance industry. '[C]oncerns expressed by many individuals who wrote to the Commissioners or testified at the hearings to express their sincere and honest bewilderment about the fact that such costs appear to fall more heavily upon those least able to pay are clearly well deserving of further consideration by the Department to identify these perceived inequities';

"3. That the methodologies used to develop geographical rates reasonably achieve the goals intended and therefore are actuarially valid." (*County of Los Angeles* v. *Farmers Ins. Exchange, supra,* 132 Cal.App.3d 77, 84-85, summarizing the Commissioner's "Findings and Recommendations" filed Dec. 20, 1979.)

The county then filed suit against the insurers and the Commissioner. The trial court upheld demurrers, with leave to amend as to the Commissioner but without leave to amend as to the insurers. On appeal from the latter ruling, the Court of Appeal held that the county had failed to exhaust its administrative remedies because it had not insisted that the Commis-

Apart from proceedings through the Insurance Commission, the California statutes provide a judicial remedy against discriminatory insurance practices. The Rosenthal-Robbins Auto Insurance Nondiscrimination Law (Ins. Code, § 11628 et seq.) prohibits a refusal to issue insurance on the same conditions as in other comparable cases for reasons of race, language, color, religion, national origin, ancestry, or "location within a geographic area." This last phrase is defined, however, as "a portion of this state of not less than 20 square miles defined by description in their rating manual of an insurer. . . . Differentiation in rates between geographical areas shall not constitute unfair discrimination." Thus the law has been interpreted to authorize territorial rate differentials, so long as rates are uniform within 20-square-mile blocks (See *County of Los Angeles* v. *Farmers Ins. Exchange, supra,* 132 Cal.App.3d 77, 84-85.) The result of the 20-square-mile provision is that insurers can draw lines which have the practical effect of discriminating between applicants on the basis of race.

In sum, the deficiencies in California legislation and administrative regulation are apparent. The present case, however, is not a very suitable one for examining these deficiencies. Plaintiffs have not sought relief from the Commissioner, and thus may encounter questions of exhaustion of remedies. Even apart from those questions, the absence of the Commissioner as a party litigant may deny the court precise information concerning the Commissioner's policies and practices, and leave the court uncertain as to the reasons which he or she might advance in defense of those policies and practices. Finally, plaintiffs' failure to include insurance companies as defendants limits judicial inquiry into whether insurers are charging unfair or discriminatory rates in violation of Insurance Code section 1852, or following practices which violate section 11628.

(3) *The California Automobile Assigned Risk Plan*

Insurance Code section 11620, provides simply that the Commissioner "shall approve or issue a reasonable plan for the equitable apportionment, among insurers admitted to transact liability insurance, of those applicants for automobile bodily injury and property damages liability insurance who are in good faith entitled to but unable to procure such insurance though ordinary methods." Rates are set by the Commissioner after public hearing. Current rates are based on the driver's age, sex, use of the car, and place of

---

sioner render findings on the specific unlawful practices alleged in the original complaint. (132 Cal.App.3d 77, 87.)

We have not been informed about any further developments in this suit. And despite the reservations in the Commissioner's 1979 decision, the Commissioner has done little or nothing to curb pricing polices which "fall more heavily on those least able to pay."

residence. Drivers with good records receive a small reduction in rates; those with bad records a somewhat larger increase in rates.

Although assigned risk rates also use territorial classifications, the impact of such classifications is much less than in private rates. Assigned risk rates for South Central Los Angeles run about 15 percent above the average assigned risk rates. The record does not contain equally exact information about private rates, but comments in declarations and briefs suggest that the comparable figure for private rates would exceed 100 percent. It is clear that for many drivers in South Central Los Angeles, including many with clean driving records, assigned risk rates are substantially less than available private rates.[17]

The assigned risk program does overcome some of the objections to private insurance regulation: assigned risk rates are set by the state after public hearing, are available for public scrutiny, and subject to judicial review. It does not, however, eliminate the fundamental problems faced by residents of South Central Los Angeles. Assigned risk rates, like private rates, are established on a basis of weighing revenue against expected loss, with no consideration of affordability.[18] There appears to be no sense that driving record should be entitled to greater weight, or residence to lesser weight, than the actuarial computations would indicate. As a result, assigned risk rates remain prohibitively high for many residents of urban areas. Such rates, however, are not properly subject to review in the present case, but should be challenged at the rate determination hearing before the Commissioner, or upon judicial review of his determination.[19]

---

[17] Plaintiffs assert that a person insured under the program is often rejected or charged higher rates by private companies when he seeks additional insurance (collision or comprehensive coverage, or liability coverage above the minimum). He may also be subject to discrimination when he later tries to leave the program and obtain private coverage. The Commissioner has taken note of this discrimination, but true to the philosophy that nothing is unfair which is actuarially sound, he has ordered the insurers only to desist from discrimination if they cannot show actuarial justification.

[18] In 1985 the insurers requested an increase in assigned risk rates of 60 percent. The Commissioner granted only a 20 percent increase. His opinion, however, makes no mention of affordability, but rejects the insurers' proposal because it did not take account of investment income.

[19] Amicus Consumers Union did appear at the hearing to set the rates which took effect in January of 1987. It complains that while it was permitted to put on its evidence, it was not permitted to participate as a party and to cross-examine the insurers' witnesses. Consumers Union further claims that the Commissioner's decision simply stated the alternatives and adopted one of them, without considering Consumers Union's contentions—a format which impedes judicial review. The complaints sound very much like those plaintiffs raise about Commissioner action under section 1852.

### (4) *Criminal and License Revocation Proceedings*

Although the present decision upholds the facial validity of the 1984 financial responsibility legislation, it does not determine whether its criminal and revocation procedures can validly be applied to individual cases. If a defendant can show that insurance was not available to him upon a fair and reasonable basis, at rates he could afford, I would think he would have an arguable defense to any criminal proceeding. In *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999], for example, we held it unconstitutional to imprison a person because he could not afford to pay a fine. The fact that the statute on its face did not discriminate against the poor (a rich man who refused to pay the fine would also go to jail), we said, did not foreclose a constitutional attack; the practical effect of the statute as applied was to discriminate on the basis of wealth. By the same reasoning, I would question whether the state can constitutionally fine a man because he cannot afford to buy insurance, especially if the reason he cannot afford insurance is that, because of his race and poverty, he lives in a part of the state where insurance rates are far higher than in more affluent areas.

The same concern arises in license revocation proceedings. In *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979], we observed that " '[o]nce licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood.' . . . [A] person deprived of the right to drive may forfeit his employment and suffer other disabilities." (P. 796, quoting *Bell* v. *Burson* (1971) 402 U.S. 535, 539 [29 L.Ed.2d 90, 94, 91 S.Ct. 1586].) The impact of license revocation may be far more severe than a $100 to $240 fine. Realistically, the practical effect of revocation is probably to convert a licensed uninsured driver into an unlicensed uninsured driver. But if the driver again encounters the police, he faces conviction for driving with a revoked license, and a possible jail term.

### (5) *Conclusion*

When it comes to automobile liability insurance, the poor pay more or do without. Private companies have been increasingly unwilling to insure residents of certain low-income urban neighborhoods, particularly South Central Los Angeles. Residents are forced to turn to the assigned risk program, paying rates much higher than available through private insurance to persons living in other areas. Those who cannot afford such rates drive without insurance.

This serious social problem has, with enactment of Vehicle Code section 16028, become a legal problem. That statute was intended to compel previously uninsured drivers to purchase insurance by threatening the violator

with fines and suspension of his driving privileges, yet it did nothing to ensure that insurance was available. Thus the poor no longer have the option of driving without insurance; to comply with the law, they must stop driving, whatever the consequences.

The state's program for assuring the availability of insurance, however, has not kept pace with its financial responsibility laws. Certain problems are apparent: the failure to consider affordability in regulating private rates and setting assigned risk rates; the failure to consider the unfairness of charging a good driver higher rates because of the poor driving habits of his neighbors; the injustice of geographic boundaries which discriminate against the poor; the procedural deficiencies in the Commissioner's office which make it virtually impossible for an individual to challenge the rates and terms offered him. The present case, however, is not a suitable one for resolving those issues. Plaintiffs have limited their attack to selected procedural issues, avoiding the question whether current private or CAARP rates are fair and reasonable. Nothing presented here would justify a conclusion that the 1984 financial responsibility law is facially unconstitutional. Thus on the record before us I concur with the majority that we should sustain the trial court's ruling denying a preliminary injunction.

Mosk, J., concurred.