[No. C012197. Third Dist. Aug. 24, 1992.]

DEPARTMENT OF FISH AND GAME, Plaintiff and Appellant, v. ANDERSON-COTTONWOOD IRRIGATION DISTRICT, Defendant and Respondent.

1556

## COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Denis D. Smaage and Mark J. Urban, Deputy Attorneys General, for Plaintiff and Appellant.

Joseph J. Brecher as Amicus Curiae on behalf of Plaintiff and Appellant.

Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares and William H. Baber III for Defendant and Respondent.

## OPINION

SIMS, J.—Plaintiff California Department of Fish and Game (the Department) appeals from the trial court's denial of a preliminary injunction to prevent defendant Anderson-Cottonwood Irrigation District (ACID) from operating a pump diversion facility on the Sacramento River in a manner that results in the killing of an endangered species, the winter-run chinook salmon (Oncorhynchus Tshawytscha). The principal issue on appeal is whether the California Endangered Species Act (CESA) (Fish & G. Code, § 2050 et seq.[1] ), and specifically section 2080,[2] protects endangered species against destruction incidental to lawful activity or whether the act prohibits only hunting- or fishing-related activity. We will conclude that section 2080's proscription against "taking" or "possessing" endangered species is not limited to hunting or fishing but includes the killing of fish resulting from lawful irrigation activity. We will therefore reverse the judgment (order).[3]

---

[1]Undesignated code references are to the Fish and Game Code.

[2]Section 2080 provides: "No person shall import into this state, export out of this state, or *take, possess,* purchase, or sell within this state, any species, or any part or product thereof, that the commission determines to be an endangered species or a threatened species, or attempt any of those acts, except as otherwise provided in this chapter, the Native Plant Protection Act (Chapter 10 (commencing with Section 1900) of this code), or in the California Desert Native Plants Act (Division 23 (commencing with Section 70500) of the Food and Agricultural Code)." (Italics added.)

[3]We allowed the filing of an amicus curiae brief in support of the Department by the Mountain Lion Preservation Foundation and the Sierra Club. The brief addresses the federal Endangered Species Act (16 U.S.C. § 1531 et seq.). Although the Department's opening brief

FACTUAL AND PROCEDURAL BACKGROUND

The facts, as found by the trial court and uncontested by the parties, are as follows:

"1. [ACID] has operated pursuant to the authority in Division 11 of the California Water Code since the early 1920's, providing, acquiring, transporting, and distributing irrigation water to its customers.

"2. [ACID] draws water from the Sacramento River in Shasta County at various points, including a diversion works, known as the Bonneyview Pump Diversion Facility, which, through the use of several pumps, draws water out of the Sacramento River and places it into an irrigation conveyance canal system of approximately 2 1/2 or 3 miles in length, commonly known as 'Lateral 3'. . . . [T]he water drawn from the river by this facility is delivered to some 270 agricultural landowners for irrigation purposes during certain months of the year, generally beginning in the Spring and concluding in the Fall. Except for the addition or replacement of pumps several decades ago, the location and function of this diversion facility have been constant for the past half century.

"3. Winter-run chinook salmon, designated as an endangered species pursuant to the provisions of [CESA], utilize the habitat of the upper Sacramento River, including areas upstream of the Bonneyview Pump Diversion Facility, for spawning and development of young fish prior to downstream migration to the Pacific Ocean.[4]

"4. [The Department's] studies and estimates of the population of annual returning adult fish reveal that in the last 25 years, the runs have plummeted from tens of thousands to only a few hundred. They have continued to drop rapidly in the past 3 years to what appear to be critically low levels.[5]

---

urges a broad construction of CESA consistent with the federal act, the Department's closing brief declines the assistance of amicus curiae's brief as immaterially focussing on indirect harm rather than direct destruction. As will appear, we resolve this case under state law; therefore, we do not address the federal act.

[4]Pursuant to the authority of section 2070, the Fish and Game Commission in 1989 declared winter-run chinook salmon to be an endangered species. (Cal. Code Regs., tit. 14, § 670.5, subd. (a)(2)(M).) The chinook salmon is an anadromous fish, i.e., one which spawns in freshwater, reaches mature size while rearing in salt water, and returns to reproduce in freshwater. (See tit. 14.)

[5]In 1966, the Department began conducting counts of returning adult winter-run salmon at the newly constructed Red Bluff Diversion Dam on the Sacramento River. These counts indicate the population has declined 97 percent in less than two decades from a three-year

"5. Seaward migration for recently hatched and emerging "fry" chinook salmon begins in Summer and continues until the following early Spring with peak months being in August through October.

"6. During the operation of the Bonneyview Pump Diversion Facility, emergent and migrating winter-run chinook salmon fry are drawn into the pumps and thus either killed by the pump blades or passed through into the irrigation conveyance canals where they ultimately perish. The [Department] estimates that of the total annual population of winter-run chinook salmon emergent fry this year, between 1.23% and 2.45% have been entrained or drawn into the Bonneyview Pump Diversion Facility, as of late September."

In September 1991, the Department filed a complaint for injunction and temporary restraining order to enjoin ACID's diversion operation until it implemented measures to avoid the incidental taking of winter-run chinook salmon. According to the pleading, in 1990 the Department obtained funding for the construction of a protective fish screen on the Bonneyview pumps, but ACID refused to enter into an agreement with the Department for installation of the screen.

In October 1991, the trial court issued a temporary restraining order, restraining ACID from "operating or maintaining ACID's Bonneyview Pumping Facility in such a manner that winter-run chinook salmon [ ] are taken in violation of the provisions of the Fish and Game Code. . . ."

Following a hearing, the trial court denied the Department's application for a preliminary injunction and dissolved the temporary restraining order. The court's decision was based on its conclusion that section 2080's prohibition against "taking" and "possessing" endangered species pertains only to "hunting and fishing related activity."

DISCUSSION

I

An order denying a preliminary injunction is an appealable order. (Code Civ. Proc., § 904.1, subd. (f); *Abar* v. *Rogers* (1981) 124 Cal.App.3d 862, 864 [177 Cal.Rptr. 655].)

A determination to grant or deny a preliminary injunction requires the trial court to consider the likelihood that the plaintiff will prevail on the merits at

---

average of about 84,000 fish in years 1967-1969, to 2,000 fish in years 1982-1984. Subsequent years have shown further reduction, with 550 returning in 1989, 441 returning in 1990, and only 191 returning as of July 1991. ACID does not dispute these figures.

trial and to weigh the interim harm to the plaintiff if the injunction is denied against the harm to the defendant if the injunction is granted. (*King* v. *Meese* (1987) 43 Cal.3d 1217, 1226-1227 [240 Cal.Rptr. 829, 743 P.2d 889].) In such circumstance, the review on appeal is for abuse of discretion. (*Ibid.*)

Here, however, the trial court did not make any determination regarding the relative harm to the parties in granting the injunction because the court decided, based on its interpretation of the statutes, that the Department could not prevail on the merits. This presents a question of law, which we review de novo. (*Sutco Construction Co.* v. *Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].)

"On review, a trial court's order with regard to a preliminary injunction may be affirmed if either the balance-of-hardships analysis or plaintiffs' likelihood of success considerations would alone support the ruling. [Citation.] However, if the trial court relies on but one of the foregoing, the reviewing court must determine whether that reliance conclusively supports the trial court's determination regardless of the remaining considerations." (*King* v. *Meese, supra*, 43 Cal.3d at pp. 1227-1228.) We will conclude the trial court's denial of a preliminary injunction is not supported by the court's reliance on its erroneous determination that the Department could not prevail on the merits.

The Department asks us to resolve the case on the merits, on the principle that "in an appropriate case, as when there are no factual issues requiring resolution at trial and when the issues have been extensively briefed, the merits of the action may be determined on appeal from the preliminary injunction order." (*Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1040 [264 Cal.Rptr. 194], citing *King* v. *Meese, supra*, 43 Cal.3d at p. 1228.) Since we will conclude the Department may prevail on the merits, remand would ordinarily be appropriate for the trial court to make a factual determination balancing the relative hardship to the parties. However, ACID agrees there is no factual dispute and also asks us to resolve the preliminary injunction on the merits. We will therefore do so, in the interest of judicial economy.

## II

The Department contends the trial court erred in construing section 2080 (fn. 2, *ante*) as proscribing only hunting or fishing related activity. We agree with the Department that section 2080's prohibition against "taking" or "possessing" endangered species applies to the killing of endangered species in the course of lawful activity such as ACID's irrigation efforts.

■ ACID admits its pumps entrapped and killed the salmon but claims it "is not a hunter or a fisherman and does not have the requisite intent envisioned by [CESA]." ACID thus argues that subjecting it to the constraints of CESA would impose strict liability on agricultural diverters, contrary to the Legislature's intent. We cannot agree.

■ "Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] In determining intent, we look first to the words themselves. [Citations.] When the language is clear and unambiguous, there is no need for construction. [Citation.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

■ We begin by noting that section 2080 (fn. 2, *ante*) makes it unlawful to "possess" an endangered species. We do not see how, given its plain meaning, "possess" can be construed to mean only hunting and fishing activity. ACID does not deny that it acquired possession of the fish that were diverted by its pumps. Therefore, we conclude ACID's possession was in itself sufficient to draw ACID into CESA's net.

Section 2080 also makes it unlawful to "take" an endangered species. Section 86 provides: " 'Take' means hunt, pursue, catch, capture, or *kill*, or attempt to hunt, pursue, catch, capture, or *kill*." (Italics added.)[6] Section 86 therefore expressly provides that "take" means "kill." Nothing in that definition suggests that the proscribed killing must be the result of hunting or fishing. The Department also points out that section 1908 provides that no person shall "take" rare or endangered native plants. We agree that since people do not hunt or fish for plants, "take" cannot be limited to hunting- and fishing-related activities.

In addition, there is support in the case law for a definition of "take" (in § 86) that is broader than hunting or fishing. In *Churchill* v. *Parnell* (1985) 170 Cal.App.3d 1094 [216 Cal.Rptr. 876], the court considered the authority of the Department to kill unwanted white bass by the repeated application of

---

[6]The definition of "take" in section 86 is binding on the CESA unless the provisions or the context otherwise require. (§ 2.) We see no reason to reject section 86's definition of "take" here.

the pesticide Rotenone to public waters. Citing, inter alia, section 86, the court concluded, "The Legislature . . . has delegated to [the Department] the power to determine when a particular species of fish is unduly preying upon any other species of fish and the further power to kill the predatory fish." (*Id.* at p. 1098.) The court therefore necessarily determined that authority to "take" fish which are unduly preying on other fish (§ 5501) included authority to kill fish with the application of a pesticide. ACID argues that, in its application of pesticide, the Department was acting as a fisherman. Although we find the argument amusing, we cannot agree that the application of pesticide to the public waters constitutes "fishing."

We find no indication in CESA or case law that section 2080 requires a specific intent to hunt or fish.

Moreover, we reject ACID's proffered interpretation of the CESA because it would lead to absurd results in light of the clear policy statement of legislative purpose. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049] [statute should be broadly construed to effectuate legislative purpose].) Thus, section 2051 provides: "The Legislature hereby finds and declares all of the following:

"(a) Certain species of fish, wildlife, and plants have been rendered extinct as a consequence of man's activities, untempered by adequate concern and conservation.

"(b) Other species of fish, wildlife, and plants are in danger of, or threatened with, extinction because their habitats are threatened with destruction, adverse modification, or severe curtailment, or because of overexploitation, disease, predation, or other factors.

"(c) These species of fish, wildlife, and plants are of ecological, educational, historical, recreational, esthetic, economic, and scientific value to the people of this state, and the conservation, protection, and enhancement of these species and their habitat is of statewide concern."

Additionally, section 2052 provides: "The Legislature further finds and declares that it is the policy of the state to conserve, protect, restore, and enhance any endangered species or threatened species and its habitat and that it is the intent of the Legislature, consistent with conserving the species, to acquire lands for habitat for these species."

Thus, CESA makes clear that its intent is to protect fish, not punish fishermen. It is inconceivable that a statutory scheme, the purpose of which

is to protect natural resources, should be construed to allow the wholesale killing of endangered species simply because the mode of death does not involve hunting or fishing.

Thus, we conclude section 2080 prohibits the killing of endangered species in the course of lawful activity.

## III

■ ACID contends it is immunized from injunctive relief by section 2014. That statute grants the state the right to "recover damages in a civil action against any person or local agency which unlawfully or negligently takes or destroys any [living creature] protected by the laws of this state." (*Id.*, subd. (a).) Subdivision (d) of section 2014 provides in pertinent part, "This section does not apply . . . to the destruction of fish in irrigation canals or works or irrigation drainages . . . ."

Section 2014 grants an exception from *damages* liability in the circumstances described. It does not, by its plain terms, grant an exception from injunctive relief. Nor may we infer one. " 'Under the familiar rule of construction, *expressio unius est exclusio alterius*, where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed.' " (*Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 410 [267 Cal.Rptr. 589, 787 P.2d 996], quoting *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].)

According to its plain terms, section 2014 does not immunize ACID from injunctive relief in the circumstances presented.

## IV

■ ACID contends the Department cannot obtain injunctive relief because it has not made the requisite showing that there is no adequate remedy at law.

■ A party seeking injunctive relief must show the absence of an adequate remedy at law. (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 253, p. 220.) Although the adequacy of a particular remedy is a question of fact for the trial court (*People* v. *Monterey Fish Products Co.* (1925) 195 Cal. 548, 564 [234 P. 398, 38 A.L.R. 1186]), here the trial court did not reach the question, because it considered dispositive its decision that the Department could not prevail on the merits.

Mr. Witkin describes the situation where adequacy of a legal remedy is at issue: "The usual statement of this factor is in terms of 'inadequacy of the

legal remedy' or, even more narrowly, 'inadequacy of damages.' The idea, which dates from the time of the early courts of chancery, is that an injunction is an unusual or extraordinary equitable remedy which will not be granted if the remedy at law (usually damages) will adequately compensate the injured plaintiff. [Citation.] [¶] Our statutes cover this factor in the following language: 'When pecuniary compensation would not afford adequate relief.' ([Code of Civ. Proc., § 526, subd. (a)(4); Civ. Code, § 3422, subd. (1)].) 'Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief.' ([Code of Civ. Proc., § 526, subd. (a)(5); Civ. Code, § 3422, subd. (2)].) [Citations.]" (6 Witkin, *op. cit. supra*, § 253, p. 220.)

 In this case, money damages are inadequate because, as we have noted, a damages remedy is precluded by section 2014.

The adequate remedy, in ACID's view, is found in other (non-CESA) provisions of the code, authorizing the Department to install a fish screen on conduits such as ACID's facility to prevent diversion of fish. Thus, sections 6021[7] and 6023[8] allow the Department to install a fish screen and require the conduit owner to cooperate and supply water to return fish trapped by the screen back to the river. The Department may install the screen even in the absence of owner cooperation, unless the owner requests intervention of the

---

[7]Sections 6021 to 6024 apply to diversions less than 250 cubic feet per second. The parties do not dispute the applicability of these provisions to ACID.

Section 6021 provides: *"The department* shall examine new or existing conduits, and *may install,* maintain, repair, and replace *fish screens,* bypasses, or other devices to prevent the passage of fish through a conduit, when in the opinion of the department such a screen or device is practical and necessary. The owner of a conduit shall grant to the department the right of access to the conduit for the installation and maintenance of the screen, and shall provide the department with an easement for a site for the installation of the screen or device deemed suitable by the department. The owner shall also supply sufficient water for a bypass to carry fish stopped by the screen or device back to the channel from which they were diverted, and an easement for the bypass channel, but such easement shall not require the acquisition or leasing of additional lands by the owner. No water for a bypass shall be required if the channel from which the water is diverted is dry or incapable of supporting fish life below the point of diversion." (Italics added.)

[8]Section 6023 provides: "The department shall serve written notice upon each owner of its intention to install a fish screen, and shall describe therein the distance downstream from the intake or in other manner the location of the screen, the access required, and the amount of water required for the bypass. The notice shall be served upon the owner in duplicate, and in such form that the original copy upon signature by the owner shall serve as an agreement to the installation of the screen or device under the terms therein, and shall require the owner to render such assistance, other than mechanical repair or replacement of parts, necessary to keep the screen or device in satisfactory operating condition. The hiring of additional labor shall not be required for such assistance."

Department of Water Resources (DWR). (§ Section 6024.[9]) Section 6024 also provides an administrative remedy in that certain technical disputes, such as size and type of screen, must be submitted for resolution to the DWR. Section 6028 provides: "All money paid by the Department to the owner of a conduit pursuant to this article shall be paid out of the Fish and Game Preservation Fund."

Here, section 6021 provides the Department *"may"* install fish screens. The duty is plainly discretionary. ACID cites no authority for the proposition that a public entity has an adequate remedy at law by expending public funds in the exercise of a discretionary duty. Nor has our independent research disclosed any authority supporting that view.

ACID claims it has no power to install a fish screen. ACID cites authority for the general proposition that its own powers are limited to those conferred by the Water Code. (E.g., *Bottoms v. Madera Irr. Dist.* (1925) 74 Cal.App. 681, 701 [242 P. 100].) According to ACID, it does not have the power to operate district-owned property for the specific purpose of preserving fish. However, ACID fails to cite any specific authority that would prevent ACID from installing a screen to protect the fish in the course of its operations. To the contrary, we have held that an irrigation district's right to divert water from the river for irrigation purposes carries with it an implied duty in so doing to protect fish.[10] (*People v. Glenn-Colusa Irr. Dist.* (1932) 127 Cal.App. 30, 36 [15 P.2d 549].)

None of the other cases cited by ACID support its position that injunctive relief is improper under the facts of this case. (*Livingston Rock etc. Co. v. County of L. A.* (1954) 43 Cal.2d 121, 128-129 [272 P.2d 4] [certiorari or mandamus was adequate remedy to test proper exercise of discretion by regional planning commission]; *Morrison v. Land* (1915) 169 Cal. 580 [147

[9]Section 6024 provides: "If the owner fails to sign and return the agreement granting the department the necessary rights for the installation of the screen or device within 60 days after its service on him, the department may install the screen as though the agreement had been signed unless a decision of the Department of Water Resources is requested. In the event the department and the owner of the conduit cannot agree upon the type, size, mesh, or location of the screen or device, the amount of water required for a bypass, or the time within which the screen or device shall be installed, the matter shall be submitted for determination to the Department of Water Resources, whose decision thereon shall be final and conclusive. The Department of Water Resources shall render its decision within 60 days after either the department or the owner has submitted the matter in writing and requested a decision."

[10]ACID argues the Legislature did not intend to prohibit its irrigation activity. However, ACID will not be enjoined from conducting its operations but only from doing so in a manner that violates its implied duty to protect the fish.

ACID also emphasizes that the Department has been aware of the pumping activity for more than 20 years. The point is immaterial.

P. 259] [specific performance of contract not available where damages remedy sufficient]; *Triangle Ranch, Inc.* v. *Union Oil Co.* (1955) 135 Cal.App.2d 428, 434, 438 [287 P.2d 537] [injunctive relief not available where proper remedy was administrative mandamus to review regional planning commission decision]; *North Side etc. Assn.* v. *Hillside etc. Park* (1945) 70 Cal.App.2d 609, 615 [161 P.2d 618] [in action to attack validity and to set aside cemetery permit, injunctive relief not available where adequate remedy was afforded plaintiffs by a writ to review legality of administrative board's action in granting the permit].)

We conclude the Department has no adequate remedy at law, so that injunctive relief is an available remedy in this case.

## V

In a related argument, ACID contends relief is barred by the Department's failure to exhaust administrative remedies. The rule is that where a right is given and a remedy provided by statute, the remedy so provided must ordinarily be pursued before the courts will supply a legal remedy. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373].)

In ACID's view, the Department was required to pursue resolution through DWR pursuant to section 6024 (fn. 9, *ante*). The Department responds that the exhaustion doctrine does not apply here, because the installation of a fish screen by the Department is optional and is not a prerequisite to court action. We again agree with the Department.

We recognize that section 6024 contains mandatory language requiring submission of *certain* disputes to DWR. However, the specified disputes—type, size, mesh, or location of the screen, amount of water required for a bypass, or time frame for installation—are expressly limited to technical matters presumably within the particular expertise of DWR. Here, as we have indicated, the dispute related to legal rather than technical questions. While section 6024 would prevent the Department from installing a screen if *ACID* had requested a decision from DWR, nothing in the statute compels the Department to resort to DWR in the absence of a factual dispute.

This case is thus distinguishable from the authorities cited by ACID, wherein applicable administrative remedies were provided. (*Gantner & Mattern Co.* v. *California E. Com.* (1941) 17 Cal.2d 314, 317 [109 P.2d 932] [statute provided for Employment Commission review of referee's determination of dispute over unemployment benefits]; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715] [same];

*Teeter* v. *Los Angeles* (1930) 209 Cal. 685, 687 [290 P. 11] [Street Improvement Act provided that all protests against proposed work be first submitted to city council]; *Yamaha Motor Corp.* v. *Superior Court* (1986) 185 Cal.App.3d 1232 [230 Cal.Rptr. 382] [New Motor Vehicle Board had particular expertise and statutory authority to decide auto franchise dispute]; *Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 983-986 [201 Cal.Rptr. 379] [Insurance Code provided pervasive and self-contained administrative procedure for monitoring insurance rates and anticompetitive conditions that might produce such rates].)

We conclude this action is not barred by the doctrine of exhaustion of administrative remedies.

## VI

As noted, both parties ask us to rule on the merits of the preliminary injunction. The Department presented evidence in the trial court of the alarming decrease of this endangered species. ACID makes no specific argument on appeal that it will be harmed by imposition of a preliminary injunction. We therefore conclude the balance of hardship tips in favor of Oncorhynchus Tshawytscha.

We conclude section 2080 applies to the destruction of fish incidental to lawful irrigation activity, and the Department is entitled to a preliminary injunction. In light of our conclusion that section 2080 applies, we need not address the parties arguments regarding the purpose of the *federal* Endangered Species Act (16 U.S.C. § 1531) and whether the federal act would preempt CESA in the event we were to uphold the trial court's narrow interpretation of state law.[11]

---

[11]ACID asks us to take judicial notice of a pending U.S. Department of Administrative Hearing proceeding before the U.S. Department of Commerce, scheduled for hearing in June 1992, for the purpose of determining whether a fine of $700,000 should be imposed against ACID under the federal act for the killing of the winter-run chinook salmon for the same time period covered by this action. The Department's briefs do not mention the administrative proceeding. We decline to take judicial notice, because ACID has given us nothing to notice. Thus, ACID has not presented any documentation or declarations regarding the nature and substance of the administrative action. Moreover, ACID's purpose in seeking judicial notice is unclear. ACID states the Department "has exercised the federal pre-emption laws by consulting and cooperating with" federal authorities. Because the point is unexplained and unsupported by authority, we disregard it.

ACID also asks that we take judicial notice that the Department has not entered some kind of cooperative agreement with the United States, as authorized by federal law. This undeveloped point is disputed by the district. We decline to take judicial notice.

## DISPOSITION

The judgment (order) is reversed and the cause remanded with directions to the trial court to vacate its order denying preliminary injunction and to enter a new order granting the preliminary injunction. The Department will recover its costs on appeal.

Sparks, Acting P. J., and Scotland, J., concurred.