[No. C033885. Third Dist. Jan. 30, 2001.]

CALFARM INSURANCE COMPANY, Plaintiff and Appellant, v.
DANIEL WOLF, Defendant and Respondent.

812

**COUNSEL**

Horvitz & Levy, Peter Abrahams, Nina E. Scholtz; Lewis, D'Amato, Brisbois & Bisgaard, Richard L. Antognini and Claudia J. Robinson for Plaintiff and Appellant.

Law Offices of Lynn Hubbard III and Lynn Hubbard for Defendant and Respondent.

**OPINION**

**DAVIS, Acting P. J.**—Insurance Code section 11580.2 (section 11580.2), in part, governs insurance companies in providing uninsured motorist coverage (UMC). Subdivision (c)(2) of section 11580.2 authorizes an insurer to

exclude UMC for bodily injury of its insured if the insured is in, upon, entering into, or alighting from, a motor vehicle that is not described in the insured's auto policy and the owner of that vehicle "has insurance similar to that provided in this section."

We conclude that where the insured has $100,000 in UMC and the owner of the nondescribed vehicle has $30,000 in UMC, the owner does not have "insurance similar to that provided in this section." Consequently, the exclusion authorized by subdivision (c)(2) of section 11580.2 does not apply, and we affirm the judgment. (In referring to this statutory language, we will refer to the insured as the injured insured and to the owner as owner.)

## BACKGROUND

On January 10, 1997, defendant Daniel Wolf (Wolf) was a passenger in a car driven by Richard Morgan (Morgan). They were rear-ended by an uninsured drunk driver going approximately 50 miles per hour. Morgan had UMC through State Farm Insurance Company, with a coverage limit of $30,000. The limit amount was paid to Wolf.

Wolf had UMC through plaintiff CalFarm Insurance Company (CalFarm), with a coverage limit of $100,000 per person. Wolf made a UMC claim under his CalFarm policy. CalFarm and Wolf disputed whether Wolf's UMC applied, and CalFarm filed a declaratory relief action to resolve the coverage dispute.

The trial court ruled in Wolf's favor in a summary judgment motion on the issue of coverage. This appeal ensued. (Wolf and CalFarm had previously arbitrated the issue of damages in binding arbitration. The arbitrator awarded Wolf $120,000 in damages, subject to a "reduction for amounts paid by other insurance[]"; the arbitrator found the "credit that CalFarm is entitled to receive is $36,064.00 leaving a net recovery to Mr. Wolf of $83,936.00." The arbitration award was expressly made subject to determination of the coverage dispute. As the arbitrator explained, "[T]he Court's ruling will be dispositive on the issue of coverage. If no coverage exists, [Wolf] has received all he will for this accident. If coverage does exist, then the findings herein would be binding upon the parties.")

## DISCUSSION

Two subdivisions of section 11580.2 are pertinent here, subdivisions (c)(2) and (d) (hereinafter subdivisions (c)(2) and (d), or section 11580.2(c)(2) and (d)). They state respectively:

"(c) The insurance coverage provided for in this section [including UMC] does not apply either as primary or as excess coverage: [¶] . . . [¶]

"(2) To bodily injury of the insured while in or upon or while entering into or alighting from a motor vehicle other than the described motor vehicle if the owner thereof has insurance similar to that provided in this section. [¶] . . . [¶]

"(d) Subject to paragraph (2) of subdivision (c), the [UMC] policy or endorsement may provide that if the insured has insurance available to the insured under more than one uninsured motorist coverage provision, any damages shall not be deemed to exceed the higher of the applicable limits of the respective coverages, and the damages shall be prorated between the applicable coverages as the limits of each coverage bear to the total of the limits."

Pursuant to section 11580.2(c)(2), Wolf's UMC policy with CalFarm contains the following exclusion (which we will refer to as Exclusion 2b):

"2.   Exclusions

"This insurance [UMC] does not apply either as primary or as excess coverage to: [¶] . . . [¶]

"b.   Bodily injury of an insured while occupying [defined in accord with section 11580.2(c)(2) as "while in or upon or entering into or alighting from"] a motor vehicle other than a motor vehicle specifically described in the Declarations as a covered auto you own, if the owner thereof has uninsured motorists insurance which applies to that motor vehicle."

Pursuant to section 11580.2(d), Wolf's UMC policy with CalFarm contains the following provision (which we will refer to as Provision 6):

"6.   Other Uninsured Motorists Insurance

"Subject to paragraph b. of 2. Exclusions in this endorsement, if an insured has insurance available under any other uninsured motorist coverage provision of any other policy, any damages shall not be deemed to exceed the higher of the applicable limits of the respective coverages and the damages shall be prorated between the applicable coverages as the limits of each coverage bear to the total of all available limits."

Thus, Exclusion 2b and Provision 6, respectively, do not mirror the language of section 11580.2(c)(2) and (d). Exclusion 2b has deleted subdivision (c)(2)'s key term "similar" so that if the owner has "any" UMC—

regardless of coverage limits—Exclusion 2b applies and the injured insured cannot look to his own UMC. Provision 6 specifies, "if an insured has insurance available under any other uninsured motorist coverage provision of any other policy," in place of subdivision (d)'s phrase, "if the insured has insurance available to the insured under more than one uninsured motorist coverage provision."

■ Section 11580.2 specifies the *minimum* in UMC that an insurer can offer.[1] The insurer is free to offer more in the way of UMC, but cannot offer less.[2] Our concern is with the section 11580.2(c)(2) phrase "similar to that provided in this section." If the term "similar" refers simply to "type" of coverage (i.e., refers simply to the owner having *any* UMC, assuming mandatory statutory minimum limits are met), then Exclusion 2b accords with section 11580.2. But if the term "similar" also encompasses "amount" of coverage (i.e., also refers to the owner having UMC of similar or greater policy limits), then Exclusion 2b, in this case, impermissibly offers less than what section 11580.2 requires an insurer to offer. The issue before us is what the phrase "similar to that provided in this section" in subdivision (c)(2) means, in the context presented here of widely disparate UMC limits of $30,000 on the owner's policy and $100,000 on the injured insured's.

■ This issue is one of statutory interpretation. Our objective in interpreting a statute is to ascertain and effectuate legislative intent.[3] In determining intent, we look first to the statute's words.[4] If those words are clear, there is no need for construction.[5] " 'When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids,' " including the object to be achieved, the evil to be remedied, public policy, the statutory scheme of which the statute is a part, and legislative history.[6]

■ The section 11580.2(c)(2) phrase "similar to that provided in this section" can be reasonably interpreted to encompass the type of coverage provided. However, it can also be reasonably interpreted to encompass the amount of coverage provided. Since the phrase is ambiguous, we will turn to extrinsic aids.

---

[1] *Hefner v. Farmers Ins. Exchange* (1989) 211 Cal.App.3d 1527, 1532 [260 Cal.Rptr. 221] (*Hefner*).

[2] *Hefner, supra,* 211 Cal.App.3d at page 1532.

[3] *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [11 Cal.Rptr.2d 222].

[4] *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th at page 1562.

[5] *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th at page 1562.

[6] *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist., supra,* 8 Cal.App.4th at page 1562.

We first examine the object to be achieved, the evil to be remedied, and public policy. "[S]ection 11580.2 is a remedial statute enacted for the purpose of forcing insurers to make available coverage by which insureds can protect themselves from the menace of uninsured motorists. Ambiguous language in the statute must be given a construction that advances, not thwarts, its remedial purpose."[7]

Construing the term "similar" in section 11580.2(c)(2) to encompass similar "amount" of coverage advances the remedial purpose of protection from the uninsured motorist menace, a menace that has grown in recent times with the high cost of auto insurance. It also assures that UMC will be provided in an amount at least similar to the injured insured's UMC.

Limiting the term "similar" to the "type" of coverage thwarts this remedial purpose by providing UMC only in the amount the owner has purchased, which, as in this case, may be much lower than the injured insured's UMC.

Furthermore, as noted, section 11580.2 was enacted to force insurers to make UMC available; the Legislature wanted to encourage the purchase of this coverage.[8] All auto liability policies issued in California must contain UMC with certain minimum limits, but an insurer and an insured may agree to waive this coverage.[9] Limiting an injured insured to the owner's much lower UMC limits would discourage its purchase by making such coverage less attractive to the injured insured.

"[O]ne of the most basic tenets of insurance/contract law [is] that the insured should get that which []he bargained for."[10] "This is why courts interpret the uninsured . . . provisions in a manner '[which] places [the insured] in the same position []he would have been in had []he been driving [his] own vehicle when the accident occurred.' "[11]

Wolf paid UMC premiums for $100,000 per person and $300,000 per accident. He was an auto passenger involved in an accident with a liable

---

[7]*National Auto. & Casualty Ins. Co. v. Frankel* (1988) 203 Cal.App.3d 830, 836, footnote 2 [250 Cal.Rptr. 236] (*National Auto*); accord, *Hightower v. Farmers Ins. Exchange* (1995) 38 Cal.App.4th 853, 861-862 [45 Cal.Rptr.2d 348] (*Hightower*); *Hefner, supra,* 211 Cal.App.3d at pages 1530-1531.

[8]See Traffic Accident Consequences Subcommittee of Assembly Committee on the Judiciary, Final Report (Apr. 1959) 3 Appendix to Assembly Journal (1959 Reg. Sess.) pages 14-15.

[9]Section 11580.2, subdivision (a)(1), (2).

[10]*Howton v. Mid-Century Ins. Co.* (D.Wyo. 1993) 819 F.Supp. 1010, 1013 (*Howton*); see also *Hefner, supra,* 211 Cal.App.3d at pages 1534-1535; *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1219-1220 [11 Cal.Rptr.2d 918] (*Gardner*).

[11]*Howton, supra,* 819 F.Supp. at page 1013, quoting *Hefner, supra,* 211 Cal.App.3d at page 1534.

uninsured motorist. According to CalFarm, under section 11580.2(c)(2), Wolf's $100,000 in UMC is unavailable because the owner had UMC for $30,000. Under this view of section 11580.2(c)(2), Wolf does not "get that which []he bargained for."[12]

It is said that, " ' "the purpose of the uninsured motorist statute is *not to make all drivers whole* from accidents with uninsured drivers, *but to make sure that [they] are protected to the extent that they would have been protected had the driver at fault carried the statutory minimum of liability insurance.*" [Citation.] *The law is not designed to provide the insured with greater insurance protection than would be available under a policy containing minimum statutory limits.* [Citation.]' "[13] This may be the *minimal purpose of the UMC law*, but if an insurer offers and sells a UMC insurance policy for greater than the statutory minimum limits—as the UMC law allows[14]—the minimal purpose of the UMC law has been met and the more protective purpose of the UMC insurance policy must be effectuated. "[A]n insurance policy which on its face provides *more* than the minimum coverage required by law [will not] be read so as to eliminate that extra coverage."[15]

Our view that the term "similar" in subdivision (c)(2) encompasses amount of coverage, and not just type of coverage, is further supported by looking at the statutory scheme and the specific purposes of subdivisions (c)(2) and (d). Subdivision (c)(2) states that an injured insured's UMC does not apply if the owner has "similar" insurance. The primary purpose of subdivision (c)(2) is to prevent double recovery by the injured insured where more than one UMC policy may be implicated.[16] "Subject to paragraph (2) of subdivision (c)," subdivision (d) applies if "more than one" UMC policy applies; subdivision (d) prevents the cumulative "stacking" of multiple UMC limits (by stating the insured's damages shall not be deemed to exceed the highest single UMC limit available), and provides that the insured's damages shall be prorated between the policies as the limits of each coverage bear to the total of the limits.

If "similar" encompasses amount of coverage, there is a nice fit between the statutory scheme and the purposes of subdivisions (c)(2) and (d). If the

---

[12]See also 1 Clifford and Eisler, California Uninsured Motorist Law (6th ed. 1999) section 9.41, pages 9-27 to 9-28 (hereafter Clifford & Eisler, California Uninsured Law).

[13]*Hartford Casualty Ins. Co. v. Cancilla* (1994) 28 Cal.App.4th 1305, 1311 [34 Cal.Rptr.2d 302].

[14]Section 11580.2, subdivision (m).

[15]*Utah Property & Casualty Ins. etc. Assn. v. United Services Auto. Assn.* (1991) 230 Cal.App.3d 1010, 1020 [281 Cal.Rptr. 917].

[16]*California State Auto. Assn. Inter-Ins. Bureau v. Huddleston* (1977) 68 Cal.App.3d 1061, 1067-1068 [137 Cal.Rptr. 690]; Croskey et al., California Practice Guide: Insurance Litigation (The Rutter Group 1999) paragraph 6:1327, page 6G-22 (rev. #1 2000) (hereafter Croskey & Kaufman, Insurance Litigation).

owner's UMC limits are "similar" to the injured insured's, the exclusion of (c)(2) applies to the injured insured's UMC; subdivision (d) and its focus on "more than one" UMC policy do not apply. There is no possibility of double recovery because only the owner's UMC policy applies. (This view also dispenses with any argument that if "similar" encompasses amount of coverage, the subdivision (c)(2) exclusion is nullified.) If the owner's UMC limits, however, are much lower than the injured insured's, the subdivision (c)(2) exclusion does not apply to the injured insured's UMC because the owner does not have UMC "similar" to that of the injured insured. In that instance, subdivision (d) applies because "more than one uninsured motorist coverage provision" applies (i.e., the owner's UMC and the injured insured's UMC). Subdivision (d)'s provisions on capping the injured insured's damages (highest applicable limit) and prorating those damages then come into play; this focus on the injured insured's damages also helps to foreclose the possibility of double recovery.

Contrast this nice fit with the interplay of subdivisions (c)(2) and (d) if the term "similar" in subdivision (c)(2) means only the type of coverage. In that instance, if the owner has *any* UMC, regardless of the amount of coverage (assuming it meets mandatory statutory minimums), the subdivision (c)(2) exclusion applies to the injured insured's UMC; the injured insured can look only to the owner's UMC. Under these circumstances, the question arises as to *when* subdivision (d) will apply, given its cross-reference to subdivision (c)(2) and its focus on "more than one" UMC policy. As the court in *National Auto* recognized, "[w]ith the addition of the . . . [subdivision (d)] cross-reference [to subdivision (c)(2)], . . . it becomes harder to reconcile the two provisions, since subdivision (d) purports to be overridden by subdivision (c)(2), leaving unclear what, if anything, remains of subdivision (d)."[17]

The insurer in *National Auto* attempted to explain this quandary by noting that subdivision (d) covers "only the situation where the [injured] insured is injured while a pedestrian, or while an occupant of someone else's car not covered by uninsured motorist coverage procured by its owner, and the injured insured himself also has a second uninsured motorist policy."[18] The *National Auto* court dismissed this feeble explanation as "less than self-evident," adding, "it is hard to swallow [insurer's] characterization of such a situation as a 'much broader, even universal' one compared with [the injured

[17]*National Auto, supra*, 203 Cal.App.3d at page 834.
[18]*National Auto, supra*, 203 Cal.App.3d at page 835.

insured's/owner's] situation."[19] In *National Auto*, an injured insured had $500,000 UMC and the owner had $30,000.[20]

CalFarm has learned a lesson in rhetoric from the insurer in *National Auto*. It tenders another claim for when subdivision (d) applies in light of subdivision (c)(2). CalFarm notes that the subdivision (c)(2) exclusion applies to the injured insured whenever the owner has UMC insurance. Subdivision (d) applies when subdivision (c)(2) does not apply, for example, "when the [injured] insured is injured while occupying [his own] vehicle, but another uninsured motorists insurance policy is available." CalFarm bolsters this claim by citing to several cases where a single household has separate insurance policies covering separate vehicles, arguing that, "it is quite common for a person to have more than one uninsured motorists insurance policy available under circumstances that would not invoke the [subdivision (c)(2)] exclusion."

There are two problems with this interpretation of when subdivision (d) applies. First, with subdivision (d)'s cross-reference to subdivision (c)(2), the two subdivisions are a statutory couple, but CalFarm's argument has them more estranged than joined. Under CalFarm's scenario, subdivision (c)(2) covers its domain—if an owner has *any* UMC, an injured insured cannot look to his or her UMC. Subdivision (d) covers a separate domain—if an injured insured himself has more than one UMC policy and he is in one of his own vehicles, the highest UMC limit will apply and apparently the policies will be prorated. Second, in all but one of the cases CalFarm cites for its argument on subdivision (d)'s applicability (single household with separate policies insuring separate vehicles), the insurance policies were issued by the same insurance company. "There is no proration problem, of course," where multiple insurance policies are issued by the same insurer.[21] In such cases, that insurer—under subdivision (d)—is merely liable for the highest limits under any applicable policy.[22] CalFarm's argument on subdivision (d)'s applicability, then, reads one of the two major provisions of subdivision (d)—proration—out of the subdivision.

CalFarm's reading of subdivisions (c)(2) and (d) is also oddly limited. Under that reading, Wolf has $100,000 in UMC if he is injured in his car, on foot, on a bicycle, in an uninsured car belonging to someone else, or in a car belonging to someone else who has automobile insurance without UMC. But

---

[19]*National Auto, supra,* 203 Cal.App.3d at page 835.

[20]*National Auto, supra,* 203 Cal.App.3d at page 833.

[21]Croskey & Kaufman, Insurance Litigation, *supra,* paragraph 6:1322, page 6G-21 (rev. #1 2000).

[22]Croskey & Kaufman, Insurance Litigation, *supra,* paragraph 6:1322, page 6G-21 (rev. #1 2000).

if Wolf is injured in a car belonging to someone else who has UMC, Wolf's $100,000 UMC policy provides no protection whatsoever.[23] This reading does not comport with the remedial purpose of section 11580.2 to make coverage available by which insureds can protect themselves from the menace of uninsured motorists; it also deprives Wolf of the benefit of his bargain.[24]

There is little in the way of legislative history regarding subdivisions (c)(2) and (d). Both subdivisions were enacted in 1961 in essentially the same form as they appear today.[25] The phrase "either as primary or as excess coverage to" was added to the introductory clause of subdivision (c) in 1979.[26] It can be argued that the addition of the term "excess coverage," as applied to subdivision (c)(2), implies a meaning that if an owner's UMC is *not* "similar" to an injured insured's UMC because the owner carries much lower limits, the injured insured's UMC can serve as excess coverage to the owner's UMC.

This view finds support in the genesis of section 11580.2. Section 11580.2's enactment was prompted by a 1959 legislative subcommittee report on the consequences of traffic accidents, including the menace of uninsured drivers.[27] That report proposed the enactment of section 11580.2, including the following within subdivision (d): "The applicable [UMC] limits hereunder shall apply only as excess insurance over any other liability insurance available to such insured, and this insurance shall then apply only in the amount by which the applicable limit of liability under this endorsement exceeds the sum of the applicable limits of liability of all such other insurance."[28] Although the letter of the language of this proposal may not have found its way into the enacted subdivision (d), its spirit arguably did. Thus, the legislative history supports a view that an injured insured's UMC can provide excess coverage to an owner's lower limit UMC.

Some older decisions can be read as suggesting, or concluding in dicta, that "similar" in section 11580.2(c)(2) refers only to the type of coverage.[29] As more recent decisions point out, however, in all of these older decisions

---

[23]See *National Auto, supra,* 203 Cal.App.3d at page 835.

[24]*National Auto, supra,* 203 Cal.App.3d at page 836, footnote 2; *Hefner, supra,* 211 Cal.App.3d at pages 1530-1531; *Hightower, supra,* 38 Cal.App.4th at pages 861-862.

[25]Statutes and Amendments to the Codes 1961, chapter 1189, section 2, page 2923.

[26]Statutes and Amendments to the Codes 1979, chapter 1173, section 2, page 4579.

[27]Traffic Accident Consequences Subcommittee of Assembly Committee on the Judiciary, Final Report, *supra,* 3 Appendix to Assembly Journal (1959 Reg. Sess.).

[28]Traffic Accident Consequences Subcommittee of Assembly Committee on the Judiciary, Final Report, *supra,* 3 Appendix to Assembly Journal (1959 Reg. Sess.), page 21.

[29]*Kirby v. Ohio Cas. Ins. Co.* (1965) 232 Cal.App.2d 9, 13 [42 Cal.Rptr. 509] (*Kirby*); *Grunfeld v. Pacific Auto. Ins. Co.* (1965) 232 Cal.App.2d 4, 8 [42 Cal.Rptr. 516]; *Phoenix*

the relevant UMC insurance policies had identical limits.[30] Thus, the older decisions did not face the issue we cannot ignore: whether an owner's UMC with much lower limits constitutes "similar" insurance so as to deprive an injured insured of higher limits under his or her own UMC.[31]

Of these older decisions, the trilogy of *Kirby*, *Darrah*, and *Alcivar* is the most significant for our purposes.

In *Kirby*, the appellate court quoted approvingly the following remarks of the trial judge: " 'The intention of our [L]egislature was to provide [UMC insurance in the] minimum statutory limits of 10 and 20 thousand. When the [L]egislature used the words [in subdivision (c)(2)], "similar insurance to that provided in this Section," it did not "propose those words to provide an injured [insured] the uninsured protection beyond the statutory amounts through a combination of the [owner's] insurance, and that owned by the [injured insured] himself." ' "[32]

This reasoning is fine if the purpose of the UMC law were *restricted* to requiring UMC in the statutory minimum limits. As we have noted, however, that is too narrow a reading of the purpose of the UMC law. The UMC law authorizes an insurer to sell UMC insurance in amounts greater than the statutory minimum limits.[33] When an insurer does so, the more protective UMC insurance policy governs and the goal of providing a minimum level of protection is necessarily satisfied.[34]

The trial judge's quoted remarks in *Kirby* also included: " '[T]he [L]egislature said [in subdivision (c)(2)], "insurance similar to that provided in this Section." The only insurance provided in this Section is simply uninsured motorist coverage.' "[35] However, subdivision (c)(2) reads pursuant to its relevant component parts: "(c) The insurance coverage provided for in this section does not apply . . . [¶] . . . [¶] (2) [to an injured insured] . . . if the

---

*Assur. Co. v. Larsen* (1966) 240 Cal.App.2d 94, 97 [50 Cal.Rptr. 111]; *Darrah v. California State Automobile Assn.* (1968) 259 Cal.App.2d 243, 245-247 [66 Cal.Rptr. 374] (*Darrah*); *Interinsurance Exchange v. Alcivar* (1979) 95 Cal.App.3d 252, 258-259 [156 Cal.Rptr. 914] (*Alcivar*).

[30]*Hefner, supra,* 211 Cal.App.3d at pages 1531-1532; *Gardner, supra,* 9 Cal.App.4th at pages 1217-1218, including footnotes 5 and 6; see also Clifford & Eisler, California Uninsured Law, *supra,* section 12.23, pages 12-11 to 12-12.

[31]See Croskey & Kaufman, Insurance Litigation, *supra,* paragraph 6:1333, pages 6G-24 to 6G-25 (rev. #1 2000).

[32]*Kirby, supra,* 232 Cal.App.2d at page 13.

[33]Section 11580.2, subdivision (m).

[34]*Utah Property & Casualty Ins. etc. Assn. v. United Services Auto. Assn., supra,* 230 Cal.App.3d at page 1019.

[35]*Kirby, supra,* 232 Cal.App.2d at page 13.

owner . . . has insurance similar to that provided in this section." Since subdivision (c)(2) sets forth a UMC exclusion that insurers can place in their insurance policies,[36] placing subdivision (c)(2) in an insurance policy context would read: "(c) The insurance coverage provided for in this [UMC policy] does not apply . . . [¶] . . . [¶] (2) . . . [to an injured insured] . . . if the [owner] has insurance similar to that provided in this [UMC policy]." Reading subdivision (c)(2) in its proper context of placement in an insurance policy readily encompasses the amount of coverage within the term "similar."

Furthermore, limiting subdivision (c)(2) simply to type of coverage is still questionable even when the subdivision is read only in the context of section 11580.2 itself. Subdivision (m) of section 11580.2 states that "[c]overage provided under an uninsured motorist endorsement or coverage shall be offered with coverage limits equal to the limits of liability for bodily injury in the underlying policy of insurance, but shall not be required to be offered with limits in excess of [$30,000 per person and $60,000 per accident]." Thus, subdivision (c)(2)'s phrase "insurance similar to that provided in this section" can encompass coverage limits well above statutory minimums.

The *Darrah* court saw "no ambiguity" " 'in the meaning of the term "similar insurance" ' [in] section 11580.2."[37] As *Darrah* explained, "[t]he word 'similar' is defined as ' "Nearly corresponding; resembling in many respects; somewhat like; having a general likeness," ' and as ' "having characteristics in common; very much alike; comparable; . . . alike in substance or structure; identical. . . ." ' "[38] With all due respect, we fail to see how the term "similar" in section 11580.2 can be considered unambiguous when its definition runs the gamut from "somewhat like" to "very much alike" to "identical."

In *Darrah*, the owner and two injured insureds riding with him each had UMC for $10,000 per person and $20,000 per accident.[39] The three claimants' damages together exceeded the $20,000 limits of the owner's policy, and separately, each exceeded $10,000.[40] The two injured insureds in *Darrah* received $4,500 and $2,500, respectively, under the owner's UMC policy.[41] They pointed to the following "paradox" resulting from the *Kirby*

---

[36]*Alcivar, supra,* 95 Cal.App.3d at page 258.
[37]*Darrah, supra,* 259 Cal.App.2d at pages 246-247.
[38]*Darrah, supra,* 259 Cal.App.2d at page 247.
[39]*Darrah, supra,* 259 Cal.App.2d at pages 244-245.
[40]*Darrah, supra,* 259 Cal.App.2d at page 245.
[41]*Darrah, supra,* 259 Cal.App.2d at page 245, footnote 1.

"rule."[42] If the owner had been uninsured contrary to the state's public policy, they would have fared better because each of them would then have been entitled to a limit of $10,000 under their respective UMC policies.[43] The court in *Darrah* responded, "if we eliminated this paradox by means of the interpretation sought by [the injured insureds] we would simply create another. [The owner's] insured guests would then profit more if [they had been in] an uninsured vehicle than [in a vehicle] with $10,000-$20,000 insurance coverage."[44] A well-recognized treatise on UMC has criticized *Darrah* in this respect, explaining: "[A]s between the two paradoxes, the legislative policy underlying the uninsured motorist statutes favors indemnification, and would be far better served by substituting the second paradox, as perceived by the court, for the first raised by the claimants."[45]

The facts in *Darrah* also illustrate the even greater inequity, and consequent loss of bargain, when "similar" insurance in section 11580.2 is read to mean only the type of coverage and there are *multiple* injured insureds. A reading of "similar" to include amount of coverage softens this inequity and minimizes this loss. Moreover, when an injured insured is seriously injured, often so is the owner. A reading of "similar" to encompass only the type of coverage means that only one UMC policy (the owner's) will ever apply in the owner/injured insured context.

That brings us to the final decision in the trilogy, *Alcivar. Alcivar* noted *Darrah*'s holding: that an injured insured is not covered under his own UMC policy if that policy incorporates subdivision (c)(2)'s exclusion, and the owner's UMC policy has the same limits as the injured insured's.[46] *Alcivar* then turned to the facts before it, concluding on the issue of "similarity": "Both [the injured insured's and the owner's] policies provided coverage with policy limits of $15,000 per person and $30,000 per accident . . . . The [owner's] policy was, therefore, 'insurance similar to that provided by this Part' within the provision of [the injured insured's] polic[y] [a policy provision that was patterned on the language of subdivision (c)(2)]."[47]

*Alcivar* was decided long after *Kirby* and *Darrah*; its language suggests that policy limits play an important role in determining whether various UMC policies are "similar." Even more recent decisions, including *Hefner* and one from this court, *Gardner*, highlight inequities that can result if the

[42]*Darrah, supra,* 259 Cal.App.2d at page 247.
[43]*Darrah, supra,* 259 Cal.App.2d at page 247.
[44]*Darrah, supra,* 259 Cal.App.2d at page 247.
[45]1 Widiss, Uninsured and Underinsured Motorist Insurance (2d ed. 1990) section 13.5, page 570.
[46]*Alcivar, supra,* 95 Cal.App.3d at pages 258-259.
[47]*Alcivar, supra,* 95 Cal.App.3d at page 259.

term "similar" in subdivision (c)(2) is construed to refer only to the type of coverage, thus excluding an injured insured's much higher UMC limit from applying simply because the owner also carries UMC.[48]

We conclude that when an owner has $30,000 in UMC and an injured insured has $100,000 in UMC, the owner's UMC is not "similar" insurance for purposes of the section 11580.2(c)(2) exclusion so as to deprive the injured insured of higher limits available under his or her own UMC insurance. Wolf is entitled to receive from CalFarm the binding arbitration award on damages, in the net recovery amount of $83,936 (the arbitrator stated in his decision, "[i]f no coverage exists [under Wolf's UMC], [Wolf] has received all he will for this accident. If coverage does exist, then the findings herein would be binding upon the parties[].").

Had Wolf and CalFarm not previously agreed to be bound by the arbitrator's findings on damages, CalFarm's limit of liability under its UMC policy with Wolf would have been 100/130 × $100,000, or $76,923. The 100/130 factor is based on the "proration" provision of the policy (Provision 6) authorized by section 11580.2(d) ("prorated between the applicable coverages as the limits of each coverage bear to the total of all available limits"; here, the available limits are CalFarm's $100,000 and State Farm's $30,000). The $100,000 factor is based on the "highest limits" cap on damages found in Provision 6 that is also authorized by section 11580.2(d) ("any damages shall not be deemed to exceed the higher of the applicable limits of the respective coverages").

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Raye, J., concurred.

---

[48]*Hefner, supra,* 211 Cal.App.3d at pages 1531-1532; *Gardner, supra,* 9 Cal.App.4th at pages 1217-1218 and footnotes 5 and 6.